**ROSCOE–AJAX CONSTRUCTION CO., INC.**

v.

**The UNITED STATES.**

**No. 839–71.**

United States Court of Claims.

June 19, 1974.

O. P. Easterwood, Jr., Washington, D. C., attorney of record for plaintiff. McNutt, Dudley, Easterwood & Losch, Washington, D. C., of counsel.

Clarence T. Kipps, Jr., Washington, D. C., for The National Security Industrial Ass'n, amicus curiae. John L. Rice and Miller & Chevalier, Washington, D. C., of counsel.

David R. Schlee, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant. Rose Adewale-Mendes, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

Plaintiff was the general contractor for the construction of missile launcher shelters at McGuire Air Force Base in New Jersey. The fabrication and installation of the roof-and-door-opening mechanisms was subcontracted to a joint venture which found its work interrupted repeatedly by contract modifications (under the Changes clause) made necessary by inconsistencies in the contract drawings. Dissatisfied with the contracting officer's allowances for these changes, plaintiff appealed, on behalf of itself and its subcontractor, to the Corps of Engineers Board of Contract Appeals, and then (as was its right under the contract) to the Armed Services Board of Contract Appeals. Now it seeks review, under the Wunderlich Act, of a portion of the ASBCA's final decision. Defendant supports the Board's determination insofar as it is challenged by Roscoe-Ajax, but has counterclaimed as to aspects of that decision which were favorable to the claimant.

On cross-motions for summary judgment, Trial Judge Cooper essentially affirmed the ASBCA decision as against

plaintiff's challenge [1] and held the largest part of the counterclaim barred by the doctrine of S & E Contractors, Inc. v. United States, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). Each side has asked us to reverse the trial judge's main rulings adverse to it. The case's center of gravity lies in the Government's counterclaim, but with a bow to judicial convention we shall first treat with the plaintiff's affirmative claim.

I

Before the ASBCA there were a large number of controversies over individual items involved in the various change orders. The Board resolved the entitlement issues favorably to to the contractor and plaintiff has not raised in this court any question of that type. As for the amount of recovery, neither before the trial judge nor before us has plaintiff attacked any of the Board's factual determinations as to the quantum for any of the series of changes. The claim is wholly centered on a few overall computation contentions, only one of which remains for our decision—that the Board erred when it failed to add the sum stated in Modification No. 47 ($144,065) to the other amounts awarded for contract changes. We concur with the trial judge that plaintiff's position is completely wrong.

The contracting officer had to consider several individual changes and claims for additional compensation directed to those separate changes. This was an ongoing process, involving negotiations, conferences, an audit, and preliminary calculations. In August 1965 the contracting officer issued a "formal" decision on plaintiff's demands, finding the total additional direct and indirect costs due to these numerous and various changes, but expressly reserving determination of the subcontractor's profit and the prime contractor's (plaintiff's) markup and profit. In October 1965, he rendered a final decision, covering all costs, specifically including the matters he had reserved in August; on this computation the "gross amount of money" due Roscoe-Ajax for all the changes involving the subcontractor was found to be $641,706. The sums already paid the plaintiff for the changes were then determined to be $497,640.81, and the difference ($144,065) was found to be the "total amount of money presently owed" the contractor.[2] With respect to that amount, the decision said: "Funds are not available for payment of the above sums, but action will be initiated to obtain them. When this has been accomplished, a modification will be issued increasing the contract price, and payment will be made."

Modification No. 47, issued in April 1966, became the modification thus anticipated. It formally increased the contract price in precisely the amount determined (in October 1965) to be still owing—$144,065.

The ASBCA redetermined and recomputed all the monies to be allowed the contract on account of the myriad of changes imposed on the subcontractor (including profit, overhead and markup), but after ascertaining this total, the board did not increase that sum by the $144,065 set forth in Modification No. 47. Plaintiff insists that it should receive this amount, in addition to the gross sum found owing by the ASBCA, on the ground that the modification was a self-sufficient accord and satisfaction, showing the contractor entitled to that amount, which must be accepted, in the amount for which it stands, without in-

---

1. Although the Board found that plaintiff had been overpaid by $38,101.95, the trial judge, employing a somewhat different method of computation which used undisputed figures, concluded that plaintiff had been overpaid by a slightly lower figure—$36,348.88. See Appendix, *infra*. Neither party has objected to this phase of the recomputation, but instead

each presses its arguments on other, unrelated points.

2. The contracting officer's letter explicitly stated that this $144,065 included the profit and markup (which had been deferred in August).

quiring into its context or purpose or role in the contracting officer's computation.

■ The trial judge and defendant are correct that plaintiff is trying to recover twice for certain portions of the increased costs attributable to the changes. At plaintiff's request, the Board considered *de novo* on its merits all of the quantum due plaintiff (and, of course, its subcontractor) for the changes—without regard to Modification No. 47—and thus covered the very same ground as that instrument (in addition, of course, to much other ground). It would obviously be an unfair duplication to add the $144,065 mentioned in that document to the total to which the Board found plaintiff entitled through its own process of cost-finding.

We are not compelled by either the existence or the contents of the modification to reach such an unjust result. It is quite clear on the face of the document that it was not an independent settlement but was, instead, a simple implementation of the contracting officer's decisions of August and October 1965 with respect to profit and markup. It states plainly that it is intended "to provide for an increase in the amount due the contractor for all changes ordered by the Contracting Officer which involved the [subcontractor for the roof-and-door-opening mechanisms] as set forth in Contracting Officer's decision dated 25 August 1965 and 25 October 1965." There is no indication in its text, or in the way plaintiff treated it before the case reached the court, that it was a separate accord and satisfaction, to be given a wholly independent status. If it were such an unconnected settlement, the items it covered should have been excluded from the Board's own calcula-

tions, but plaintiff does not suggest that it asked the Board to take that course, or that the Board did so on its own. On the contrary, the contractor presented all issues of quantum for determination by the appellate administrative tribunals, and those boards decided the case on that basis. Plaintiff cannot have it both ways; as the trial judge put it: "Obviously, plaintiff cannot both appeal the amount of the award and, simultaneously claim an absolute right to that amount." The emptiness of plaintiff's position is tellingly revealed by a complete absence in its brief and argument of any convincing explanation of what the $144,065 was payment for, if not attributable to costs already included in the ASBCA's own computation There is thus no solidity to plaintiff's claim with respect to Modification No. 47, and it must be rejected out of hand.[3]

## II

The Government's counterclaim cannot be so readily disposed of. The meat of that demand is a recomputation of the quantum of the equitable adjustments allowable on all (or at least some) of the individual changes appealed to the ASBCA, and defendant also makes other, subsidiary arguments concerning the amounts due Roscoe-Ajax. The trial judge held that consideration of the bulk of the counterclaim is precluded by S & E Contractors, Inc. v. United States, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). In the light of that decision we must consider the general criteria for testing when, if ever, the Government may challenge via a counterclaim an adverse finding or determination by a board of contract appeals (or other ultimate contract administrative tribunal).

In *S & E Contractors, Inc.* the contractor was satisfied with the adminis-

3. No other demand by plaintiff is still outstanding. Plaintiff had previously advanced a similar argument with reference to Modification 44, and had also contended that the Army Audit Agency report used by the Board to compute quantum was in error. The trial judge held against plaintiff on the first point

(which is not pressed before us, and is therefore deemed to be abandoned), and disposed of the second point as discussed at n. 1, *supra*. Plaintiff also requests an overhead allowance of 15% of the amounts of Modifications 44 and 47, but our decision as to the effect of those modifications moots this issue.

trative decision and did not seek court review of any part of it. The contracting agency, the Atomic Energy Commission, was also content with its determination and willing to pay the award. It was the General Accounting Office which first indicated that the award should not be paid, and the Department of Justice took the same view when the contractor brought suit to collect the sum found by the agency to be owing but withheld because of the GAO's position. In that situation the Supreme Court ruled that the administrative decision was not reviewable under the standards of the Wunderlich Act but must be accepted as final on its face.

*S & E Contractors* obviously controls where the claimant accepts the agency decision *in toto*, but gives no flat directive where, as here, the contractor brings suit attacking a part of the administrative decision which is unfavorable to him. Drawing on different aspects of the *S & E* opinions, the parties (with amicus on plaintiff's side) proffer to us opposing rules representing the extreme ends of the spectrum.[4] From the contractor's viewpoint, it is said that any administrative finding or ruling (subsidiary or ultimate), favorable to the claimant, which the board makes in the course of a decision must be accepted without inquiry, even though the board ultimately rejects the entire claim and the contractor then sues here on the whole claim. Contrariwise, the Government's stand is that, once a contractor challenges any part of a board decision, the defendant is free to attack any other part, no matter how distant from or unrelated to the particular aspect of the decision brought to court by the contractor.[5] In capsule form, the Government's standard can be called the "decision" criterion (finality attaches only if the whole decision is left unchallenged), while the contractor's is the "finding" standard (finality is due to every individual finding accepted by the contractor).

Both of these contradictory positions have the merit of relatively easy, near-exact application by the court, and admittedly there are substantial grounds supporting each; it is difficult to formulate a useable in-between test. But we have decided that—under *S & E Contractors*, the Wunderlich Act, and the requirements of justice—we must turn aside from the seductiveness of a too-mechanical rule and attempt to live with a more amorphous standard grounded in the relationship of the Government's challenge to that posed by the plaintiff. Automatic or mostly-automatic rules serve a prime function in certain sectors of the law—such as some areas of criminal justice, of the protection of personal rights, or even some of the principles of contract interpretation—where the aim is to deter or to mold and encourage conduct. They are much less useful when, as here, their chief purpose is merely to ease or speed the course of litigation for the court and parties—often at the expense of justice and fairness in the individual case.

We first explain, briefly, why we cannot accept either of the extremes urged upon us (Subpart A), and then discuss the criterion we adopt (Subpart B). In the next section of the opinion (Part III), we apply that standard to this case.

A. The Government's thesis that acceptance of an entire administrative *decision* is an all-or-nothing proposition for the contractor is advanced in two forms. First, the decision of the board is said to be (or analogized to) an offer of settlement, which the contractor must

4. There is no hint of fraud or bad faith on the part of anyone, and that aspect of court review under the Wunderlich Act is entirely excluded from the parties' presentations and our consideration of the case.

5. The Government appears to accept for this case our ruling-by-order in Dynalectron Corp. v. United States, 199 Ct.Cl. 996 (1972), in which we rejected a counterclaim which attacked a separate board decision on a dispute arising out of the same contract and the same termination, but a separate aspect of the termination from that challenged by the contractor.

accept as a total package, or else reject wholly. Alternatively, the right of the contractor to have a final administrative determination is said to be waived by the filing of a suit in derogation of any part of that decision.

A very troublesome practical difficulty with the defendant's take-it-or-leave-it stance is that the joinder of various appeals from a contracting officer's decisions in a single administrative appellate proceeding is likely to be merely fortuitous. Appeals with the same factual and legal background may well be litigated together, but our experience has been that other considerations, such as the time a claim arose, the order or document in which claims are decided by the contracting officer, and still other irrelevancies, will often figure in the pattern of joinder or of docketing as a single case before a board. There are large construction cases, for instance, in which one board decision will dispose of a wide variety of demands, ranging from controversies over the depth of the excavation at the very beginning of the job to the issue of whether the corridor ceiling in the almost-completed building should have one or two coats of paint. But we also know that such diverse claims can often be determined in a number of separate board decisions. In the same way, a contracting officer's single letter-of-decision may decide all or most of the several items arising under the contract, or those issues can be disposed of in a series of individual rulings. It is inimical to a fair and rational disputes procedure to leave the important question of absolute finality solely to such chance (or tactical) elements.

On the more theoretical level, we think that the Government's characterization of a board decision as a settlement offer, and its attempt to construe a waiver of finality claims from the filing of a suit (however limited in scope), both underestimate the importance and misconstrue the function of the disputes procedure. As the Supreme Court noted in *S & E Contractors, supra,* 406 U.S. at 8, 92 S.Ct. at 1416:

> The disputes clause included in Government contracts is intended, absent fraud or bad faith, to provide a quick and efficient administrative remedy and to avoid "vexatious and expensive and, to the contractor oftentimes, ruinous litigation." * * * The contractor has ceded his right to seek immediate judicial redress for his grievances and has contractually bound himself to "proceed diligently with the performance of the contract" during the disputes process.

It is vital to the proper functioning of this system, as evaluated and applied by the Supreme Court in *S & E Contractors,* that a contractor not be forced to risk what he has gained before the agency—regardless of the lack of or minimal connection between the favorable and the adverse components of its determination—whenever he seeks Wunderlich Act review of an unfavorable portion of an administrative decision. The Congress which sanctioned the disputes procedure also ensured that a claimant, if he so desired, would have judicial scrutiny of the administrative holding. On this approach, it is unfair and unrealistic to interpret the filing of a suit as an all-encompassing "waiver."[6] And it

6. The Government argues that the concern expressed by the Supreme Court over the effect of "vexatious litigation" on the procurement system is irrelevant when the contractor initiates legal action in the Court of Claims. But that is only half or less than half of the story; if the Government can counterclaim without limit, a restricted appeal on an isolated or minor issue may bring into contention a morass of disputes decided to the contractor's satisfaction at the administrative level. And insofar as defendant seeks to limit *S & E Contractors* to a contractor's suit for payment withheld, that very restricted reading seems clearly wrong. We cannot believe that the Supreme Court's decision would have gone the other way if the AEC had paid S & E Contractors, Inc., despite the GAO's remonstrance, and the Department of Justice had then brought a suit to recover, or had filed a counterclaim in an action by S & E on some other contract or claim.

would be contrary to the scheme of the Wunderlich Act to deem the decision of a contract appeal board—a decision arrived at after the contractor's primary day in court,[7] and which can cover several divergent, unrelated points—to be no more than a mere offer of settlement which has to be accepted in its entirety if any aspect is to be free from challenge.

On the other hand, the position of contractor and the amicus that every unappealed administrative finding or determination is final against the Government seems to us to stretch *S & E Contractors* too far. There are many board decisions, which, on the very same matter, reject one ground for holding for the Government while deciding for it on another, or in the course of ruling against the contractor make some non-controlling finding or determination in his favor, or on a single indivisible issue (for example, of quantum or amount for an item) give the claimant less than he seeks but more than the agency is willing to allow. Plaintiff wishes the claimant to be invincibly armed with these favorable board rulings or statements—no matter how unnecessary to or remote from its final decision or how integrally related to the dispute the contractor itself presents[8]—so that he would have little but the costs of litigation to lose by bringing his part of the controversy to court. Such one-sidedness runs against the grain. Where there is but a single integral dispute, it is discriminatory to allow one party to take unchallengeable advantage of all elements in the administrative decision which are

favorable to his position while putting the other side to the test of supporting all the aspects favorable to it. A concern for striking a fair balance between the Government's interests and the rights of the private claimant was prominent in the prevailing *S & E* opinions.

The unfairness between the parties would also extend to an interference with the court's proper performance of its function. The norm is that judges, in deciding an issue, should be able to look critically at that question in the round. They should not be precluded from freely examining the elements bearing on the resolution of the specific point. They are not, without the best of reasons, to be required to put on blinders and accept an obvious error or mistake which could well lead to a wrong or inconsistent result, or to an injustice. That is why courts are not bound by partial stipulations which are incorrect in law or plainly contrary to fact (Kaminer Constr. Corp. v. United States, 488 F.2d 980, 987–989, 203 Ct.Cl. ——, —— (1973)). The same reason urges against automatic, unquestioning acceptance of any component of a board decision which is integral to the particular dispute the contractor asks the court to settle in his favor.

*S & E Contractors* does not mandate or, in our view, even suggest another conclusion. As we discuss more fully below, the Court in *S & E* stressed that contractor's entire acceptance of the agency's resolution of the *dispute*. It was in those circumstances that court review (at the defendant's instance) was

---

7. *See* United States v. Bianchi, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

8. The amicus brief says flatly that even where there is a "a dispute on precisely the same issue, e. g., Board finds costs of change to be $1,000, contractor seeks review asking for $2,000 and Department of Justice seeks to reduce to $500," the "$1,000 Board finding

is final and stands unless the contractor establishes a greater amount under the Wunderlich Act Standards or the Department of Justice proves fraud or bad faith." This would be so, apparently, even if there was an obvious arithmetical error in the Board's computation or some other clear mistake—or even if the contractor, while accepting the $1,000 award, rejected the Board's entire theory on which that award was based, or if that same theory, properly applied, inevitably led to a reduction in the sum allowed the contractor.

barred, and in that context the opinion spoke of an agreement between the contractor and the agency. The opinion did not say or intimate that the same principle holds where the claimant is dissatisfied with the agency's decision of a unitary dispute, and challenges that determination in court. When the contractor pushes aside the administrative determination of an integrated dispute, there is no reason to imply any kind of "agreement", especially not one which would hobble both the court and the Government in the ultimate resolution of the very same dispute which the contractor affirmatively asserts has not yet been correctly resolved.[9]

B. The foregoing discussion (in Subpart A) of the parties' polar positions foreshadows the ground-in-between we stake as our own. The special virtue of those rejected formulations is their ease of application, and on that score it is hard to choose between them. We think, however, that both sacrifice fairness for automatism, and both depart from what we view as the principle at the heart of *S & E Contractors*—the full acceptance by that contractor of the AEC's resolution of its dispute with the claimant, so that the particular dispute was wholly ended. In contrast to the "decision" and "finding" standards of the parties, ours is the "dispute" standard.

At numerous points in the *S & E* opinion, the Court refers to the matter at stake as the contract "dispute."[10] The touchstone for the entire decision is the Disputes clause, and the Wunderlich Act which assumes such a provision. In summing up, the Court says: "This is simply an instance where a contractor successfully resolved its *disputes* with

the agency with which it had contracted and to whom that power had been delegated." 406 U.S. at 19, 92 S.Ct. at 1421 (emphasis supplied). The clue given by *S & E*, as we see it, is to ferret out and delineate the particular "dispute" to see whether the contractor has accepted the administrative solution of that dispute, or whether he is still keeping the same dispute alive in court. If that specific dispute is over because the contractor is satisfied, then the defendant cannot challenge it in court by counterclaim when and if the claimant happens to sue on some other dispute, even if the other dispute arises under the same agreement or is determined in the same board decision. But if the particular dispute still festers because the contractor, considering it inadequately resolved by the board, comes to court for further relief, then the Government is free to examine (and to ask the court to inquire into) all facets of that same dispute.

This concept of the "same dispute", as distinguished from a "separate dispute", encompasses, in general, those aspects of a controversy which are so related to one another that they form parts of a whole and ought to be decided together. Unfortunately, we have not been able to create or divine a more precise verbal formula for computer-like use. The problem is similar to that of delineating a "claim" for the purposes of applying the principles of former adjudication, or of dealing with other principles turning on the existence of a "claim" (*e. g.* the running of limitations). In that segment of the law no hard-and-fast rule, or readily applicable solution, has been found satisfactory; instead, an informed pragmatic judgment, based on

9. The holding in United States v. Utah Constr. & Mining Co., 384 U.S. 394, 418–423, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), that relevant administrative findings "under the contract" are binding in a later breach action, "if sufficiently supported" and if "valid and appropriate," is at odds with plaintiff's view that such favorable individual findings must be accepted, when the dispute "under the contract" comes to court, regardless of whether they meet Wunderlich Act standards.

The Court noted, with respect to the particular findings involved in that case, that both parties had had "an opportunity to seek court review of any adverse findings."

10. *See*, 406 U.S. at 4, 7, 8, 9, 12, 17, 19, 92 S.Ct. 1411. It is also noteworthy that when the Court discusses administrative "decisions," it often qualifies that term with the words "disputes" or "disputes clause."

the particular facts and circumstances, is essential. The American Law Institute's latest formulation (Restatement, Second, Law of Judgments (Tent. Draft No. 1, 1973) pp. 78 ff.) ties a "claim" (for former adjudication purposes) to the "transaction, or series of connected transactions, out of which the action arose" and indicates that in fixing upon the "transaction" the tribunal is to act "pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.* at 78, *see also* 82. But "no single factor is determinative" (*id.* at 82), and it is often necessary to strike a "delicate balance" between competing interests. *Id.* at 81. *See* also Container Transport Int'l Inc. v. United States, 468 F 2d 926, 928–929, 199 Ct.Cl. 713, 718 (1972).

A comparable attitude is needed, we think, in defining the boundaries of the particular "dispute" for the purpose of applying the rule of *S & E Contractors*. The over-all principle, as we have said is to ascertain the controverted issue or issues which are so interrelated and have such a bearing on one another that they form a whole and should in fairness be decided together, and in the light of each other, rather than independently. As with the concept of "claim", no single factor is conclusive, and the elements of judgment and pragmatic appraisal, perhaps even of experienced legal intuition, come into play. We can, nevertheless, spell out two sorts of factors which provide help: (1) the treatment of the matter by the parties and the administrative board, and (2) the legal logical, and practical relationship of the matters involved.[11]

Under the first rubric there are several subsidiary factors. One indicator is that the matters involved may have been included in the same claim by the contractor, the same decision of the contracting officer, or the same ruling or opinion of the contract appeals board. As noted above, the consolidation of appeals, or of issues in one appeal, may be fortuitous, and the same can be said of a contractor's claims and contracting officers' decisions. In an appropriate instance, however, presentation or disposition of two or several matters together can suggest that they are considered on all sides to be an integral part of the same dispute. And the presence of the matters together takes on even greater significance when the parties agree to their joint treatment, i. e. indicate verbally or by their conduct during the presentation of a claim or trial before a board that they consider the matters to be part of the same underlying dispute. The parties may also treat two or more issues as intertwined by their actions during contract performance, especially at stages before a dispute has arisen. In some cases, too, a continuing course of conduct by the Government in administering a number of related contracts (perhaps including agreements with others) or the general understanding of a particular industry or trade, may rise to the level of a "trade usage" showing that the matters consistently treated together are parts of the same unit.

The second category, the legal, logical and practical interrelationship of the matters involved, also evokes a number of subordinate considerations. The issues may be grounded in the same set of facts, or closely connected facts, or they may relate to the same item, part, or aspect of the work, or call into operation the same legal principles. The claims may arise, for instance, under the same contract clause and implicate the very same rules; there may be common questions of law or fact. Again, the matters may bear an even closer relationship to each other. The decision of one might directly affect the decision of the other, or inconsistent results might follow from separating out the two problems, accord-

11. The ensuing discussion is, of course, not designed to be exhaustive.

ing finality to the board's determination on one, while having the court decide the other.

We repeat that none of these components, or others which may come to mind, is dispositive by itself. The evaluation of what is the "dispute" for S & E purposes should not be made by mathematical count of factors pro and con, but by an appraisal-as-a-whole informed by commonsense. Although the notions of "claim" and "dispute" are not the same or coterminous,[12] they both partake of the difficulty of being incapable of precise definition or mechanical detection. At the same time they share the quality of marshalling various factors toward a general but understandable goal. Looking backward to determine a prior "claim" for the purposes of res judicata (claim preclusion), a court seeks the transactions which should have been presented to the earlier tribunal in one suit. Looking forward to decide whether a "dispute" is still alive for Wunderlich Act review, or whether the contractor has closed the books on that particular dispute by accepting the administrative decision, we should draw within the circle the aspects of the controversy which are so interrelated that they should in fairness be decided together as a unit in the court suit—and not partly by a final and unreviewable board ruling or finding and partly by the court under the statutory standards.[13]

### III

We now come to test the defendant's counterclaim under this overall principle. In its petition to the court, and in its motion for summary judgment, plaintiff does not attack any of the ASBCA's factual determinations, either as to entitlement or quantum, for any of the individual contract changes. The sole ground on which the contractor challenges the Board's decision is with respect to the ultimate method of computation—after determination of the amounts due for the individual changes—by which an overpayment was found. The specific objections (see Part I, supra) are that two modifications were independent increases in the contract price, and not partial payments of the amounts found due on various changes, and that a Government audit incorrectly totalled the payments made to the contractor.

Defendant's counterclaim[14] attacks the finality of certain of the Board's findings, alleging that they are arbitrary, capricious, and unsupported by

12. The current draft of the *Restatement of Judgments, Second, supra*, points out (p. 77) that the "meaning or scope of claim is not necessarily the same in all contexts."

13. Borrowing from the set-off rule in tax refund suits (see, e. g., Missouri Pacific R.R. v. United States, 338 F.2d 668, 168 Ct.Cl. 86 (1964)), it is possible to say that the defendant can set-off but not counterclaim; on that view, the contractor would always be able to retain the amount allowed by the board but might not be able to receive more even if he had a good case on his own affirmative claim. Such a rule of set-off could be framed either to allow the Government to raise as a set-off any issue decided by the board against it (no matter how unrelated) or to confine the set-off to issues which are part of the same "dispute." We reject both versions of this solution, though it has its own attraction. If the set-off right were unlimited, the same objections would apply, in somewhat diluted form, as to an unconfined right of counterclaim. And if the Government is to be allowed to challenge aspects of a board decision which are part of the same dispute that the contractor has brought to court, then the theory of *S & E Contractors*, as we understand it, permits no barrier short of a full counterclaim. For in that event the contractor would not have accepted the administrative resolution of the dispute, and the whole dispute should therefore be open for court decision under the Wunderlich Act.

14. Defendant specifically challenges the Board's factual findings as to quantum for Modification No. 29, and the assignment of a 15% overhead rate to the subcontractor. It may also be attacking other findings as to cost due for various changes. In addition, defendant contends that the Board committed legal error in entertaining the claim designated item W, and asserts it was error for the Board to deny interest at 6% on the overpayment.

substantial evidence, with a resulting alleged overpayment to the contractor of between ninety-nine and eighty-one thousand dollars.[15]

A. We agree with the trial judge that the Government is precluded from attacking the administrative findings with respect to Modification No. 29, the overhead rate allowed for the subcontractor and the costs of other individual changes (*see* n. 14, *supra*).[16]

Plaintiff's only arguments in this court assume the correctness of the administrative findings on entitlement and quantum for all the changes, including Modification No. 29 and the subcontractor's overhead; defendant would have us reexamine those same findings on their merits. Plaintiff's claim rests on factual and legal issues which do not, except very remotely, overlap these bases of defendant's counterclaim. The contractor's attack is directed at a portion of the Board's decision which logically succeeds, and seems unconnected with, the evaluation of the individual costs of the multiple changes. It is as if the plaintiff, accepting all the individual amounts, were merely claiming that the Board made a mathematical error in adding up these individual amounts, and the defendant took that as its cue for asking the court for reexamination of the underlying factual determinations of all the individual costs.

It is clear, too, that the decision of plaintiff's claim implicates different rules and principles and would not affect in any way the merits of the counterclaim. Nor is there any unfairness to the Government in barring it from pursuing this part of the counterclaim while the plaintiff is allowed to maintain its affirmative demand. The plaintiff, on the other hand, could well be justly aggrieved, in bringing suit on what it conceives to be the legal issue of an independent accord and satisfaction

(Modification No. 47), to find that it has thereby opened for court review all of the factual determinations on the cost of the many changes.

True, the claim and the counterclaim both arise out of the same contract, the same decision of the ASBCA, and involve in general the same series of transactions relating to changes in the roof-and-door-opening mechanisms. But we are here concerned, not with delineating the same claim for res judicata purposes, but the same "dispute" under the principle of *S & E Contractors*. The answer is probably not clear-cut, but under the criteria outlined in Part II, *supra*, we think that the "dispute" Roscoe-Ajax raises in this count is separate from, and unrelated to, that which the defendant seeks to resuscitate and maintain alive. The latter is dead and finished because the plaintiff has accepted and acquiesced in the administrative determination of the amounts of the costs allowable for the various individual changes. The only controversy plaintiff stirs here is an isolated and separable dispute, involving computation and the totalling of the individual sums, and only as to that separate question can the Government present its own counter-demand. See Subpart C, *infra*.

B. We hold that the same is true of the defendant's attack on the Board's findings regarding Item W, though the problem is somewhat different. On that item, defendant does not assail the substance of the findings but rather asserts that it was error for the Board to have considered the matter at all. The Government's position is that Item W was never presented to the contracting officer and therefore it was wrong, as a matter of law, for the ENG BCA and the ASBCA, over defendant's objections, to include that item in their decisions on appeal. (The ENG BCA held plaintiff was not entitled to recover

---

15. The former figure is from defendant's counterclaim, the latter from defendant's summary judgment brief.

16. We discuss Item W separately, see Subpart B, *infra*.

on Item W but the ASBCA resolved entitlement and quantum favorably to plaintiff).

Item W involves, like Modification No. 29 and the subcontractor's overhead, a question of the validity of the administrative determination of the costs allowable for individual changes. That is part of a dispute which no longer exists because of the plaintiff's acquiescence in the Board's determination of that subject—it is plainly not part of the computation dispute now before us and with which we dealt in Part I, *supra*.

In any event, the record shows (as the trial judge held) that defendant's position is wholly without merit.[17] Item W relates to an engineering report, claimed as an item of cost. Although the decision of the contracting officer does not expressly touch on that document, his ruling of August 1965, adopted, as its basis, an Army Audit Agency report which recognized the engineering report as a claimed item of cost, but recommended its disallowance. By adopting the audit report, the contracting officer accepted the audit agency's adverse view of the engineering report.

Moreover, the record shows that the Government waived any objection to consideration of Item W on administrative appeal. Although defendant contends that objections were raised at the hearings before the ASBCA, the transcript indicates objections only as to the relevance and materiality of certain documents sought to be introduced into evidence in support of Item W. No objection was raised as to the propriety of Item W's being considered by the Board. In addition, when Item W was first presented to the ENG BCA and evidence was introduced, the Government attorney stated that he had no objection. Since the Government expressly waived objection to consideration of Item W by the ENG BCA, it should not later have

the right to bar the ASBCA from considering the same question on further appeal.

■ C. There remains defendant's contention that the Board erred, as a matter of law, in denying interest at 6% on the overpayment. This part of the counterclaim is, we tend to think, within the same dispute brought here by plaintiff, *i. e.* that the Board miscalculated in totalling the figures so as to find that there was any overpayment at all.[18] On the merits, however, we again agree with Trial Judge Cooper and incorporate what he wrote on this point: "The overpayment results from a shift in the basis on which plaintiff's equitable adjustment was computed. The Contracting Officer adopted a total-cost approach to determining the adjustment, while the ASBCA employed a change-by-change direct-cost approach. It was the direct-cost analysis that revealed that the Contracting Officer's award had been in excess of [the subcontractor's] actual costs for the disputed changes. However, the Government at one time had endorsed the total-cost approach and its auditors had attempted to negotiate a settlement on that basis. It was not until the ASBCA proceedings that the Government insisted on a direct-cost analysis for determining the equitable adjustment. Having actively supported the total-cost approach which resulted in the overpayment, defendant is in no position now to demand that, as a matter of fairness, it is entitled to interest as compensation for the loss of the use of the money found owing.

"Since, in the absence of contractual or statutory provisions, the award of interest is discretionary, Astro-Space Lab., Inc. v. United States, 200 Ct.Cl. [282, 312], 470 F.2d 1003, 1020 (1972), it is concluded that the Board did not abuse its discretion in denying interest in this case."

---

17. In some instances, it may be easier to decide against the defendant on the merits than to wrestle initially with the problem of

whether the counterclaim is maintainable at all.

18. But see note 17, *supra*.

D. Finally, we reject the defendant's contention that plaintiff, by failing to raise the application of *S & E Contractors,* has waived the point. Neither party seems to have presented this issue to the trial judge, although plaintiff's brief replying to the Government's cross-motion for summary judgment was filed several months after the Supreme Court's opinion. The finality of the administrative determination favorable to the contractor first became a recognized issue when Trial Judge Cooper held in his opinion that defendant's counterclaim was largely barred by *S & E Contractors.* Although the plaintiff has now espoused that position, defendant urges that the contractor necessarily waived this defense to the counterclaim by not raising it soon enough.[19]

We hold that plaintiff should not be barred from adopting the trial judge's holding on the administrative finality question. It is instructive that, in the *S & E Contractors* case in this court, neither party addressed itself to this issue at first, and it was the trial judge who initially proposed that the case be resolved on that ground. 433 F.2d 1373, 1374, 193 Ct.Cl. 335, 339 (1970). Although in the proper circumstances a party may waive a non-jurisdictional defense by failing to raise it (*see* Rule 38(h)), it was not beyond Trial Judge Cooper's discretion to decide the matter on the basis of an important Supreme Court opinion handed down in the middle of the parties' briefing. *Cf.* Loral Electronics Corp. v. United States, 409 F.2d 578, 580, 187 Ct.Cl. 499, 503 (1969). Nor was it too late in the case for plaintiff to grasp the trial judge's approach and assert it as its own.

The final result is that, affirming the trial judge, we grant the plaintiff's motion for summary judgment to the extent that the amount of overpayment is reduced, and otherwise deny it; conversely, defendant's cross-motion for summary judgment is granted in part (in that an overpayment is recognized) and judgment is entered for defendant on its counterclaim in the sum of $36,348.88 (*see* the Appendix, *infra*); defendant's counterclaim is otherwise dismissed.

---

## APPENDIX

I. *Roscoe-Ajax Entitlement*

| | |
|---|---:|
| Original Subcontract .........$ | 621,950.00 |
| Modifications 6, 21, 24, 26 (undisputed) ................ | 254,771.61 |
| Board Award for Modifications 28–33, 36, 40–42, and Items 0–T, V & W ............. | [1] 348,513.32 |
| Total Entitlement ....... | 1,225,234.93 |
| Less Modification 44 (undisputed) .......... | −1,626.37 |
| Net Entitlement ........ | 1,223,608.56 |

II. *Roscoe-Ajax Payments*

| | |
|---|---:|
| Original Subcontract ......... | 621,950.00 |
| All modifications up to 10–25–65 Contracting Officer ..... | [2] 493,942.44 |
| Adjustment Modification 47 ... | [3] 144,065.00 |
| Total Payments Received .. | 1,259,957.44 |

III. *Overpayment Computation*

| | |
|---|---:|
| Payments Received .......... | 1,259,957.44 |
| Net Entitlement ............ | −1,223,608.56 |
| Overpayment ........... | 36,348.88 |

1. Adjusted to include Roscoe-Ajax markups of 10% overhead, 10% profit and 1% bond. This adjustment is not disputed.

2. Includes payments (or deductions) on Modifications 6, 21, 24, 26, 28–33, 36, 37, 40–42, 44 up to that date.

3. This figure includes Roscoe-Ajax markups since these were included in the Contracting Officer's computation of entitlement in his decision of October 25, 1965.

BENNETT, Judge (concurring):

I concur in the opinion of the court but with great respect for the separate

---

19. Defendant cites our order in Keco Industries, Inc. v. United States, 199 Ct.Cl. 1020 (1972), in support of its argument. But the discussion of waiver there was in a materially different context. Keco had previously had its full day in court, and did not raise the issue of finality of an administrative decision in opposition to the Government's counterclaim (nor was this issue raised in any other way). The court decided the case on the merits, and the *S & E* issue was not brought forward until long afterwards. In these circumstances, we held the contractor barred under the principles of former adjudication from reopening the case.

views of Judge Nichols who points to many potholes in the road laid out by the majority opinion. I am concerned that the standard of what is a "dispute," as announced by Judge Davis, be strictly delineated and applied to the extent the guidelines permit. This court has not today, as I understand its intention, given the Government an open door through which to file an appeal, by counterclaim, to the administrative decision in every case docketed in this court. There must be a clear and overriding nexus between the claim brought by plaintiff and the administrative finding which the Government challenges before any Government counterclaim can be accepted for consideration. This case, and our decision today in Northland Camps, Inc. v. United States, Ct.Cl., 499 F.2d 658, surely show the difficulty inherent in deciding cases under Wunderlich Act standards which continue to evolve as courts try to interpret and apply this act. Too often, as here, this court finds itself required to be more concerned with the methods of our analysis and procedures rather than with the merits of the case before us. This judicial anomalism seriously invites legislative action, perhaps along the lines of some of the recommendations suggested by the Commission on Government Procurement. Report of the Commission on Government Procurement, Vols. 1–4 (1972), GPO Stock Nos. 5255–00002, –00003, –00004, and –00006, established by Pub.L.No. 91–129, 83 Stat. 269, as amended by Pub.L.No. 92–47, 85 Stat. 102.* Judicial time can surely be more profitably spent than in the hair-splitting and exercise of legal intuition necessitated by efforts now required to make any sense out of the Wunderlich Act. The games that lawyers like to play do not entertain the clients who must pay the price of admission and who are confused by the rules which are made up as each game progresses.

There has to be a better way, although the umpires in the present contest perhaps are entitled to some applause for great effort to assure fair play.

NICHOLS, Judge (concurring in part, dissenting in part):

I agree with and join in the portion of the court's decision, Part I that deals with the plaintiff's affirmative claim. As to Part II, that dismisses the counterclaim of the defendant on the supposed authority of S & E Contractors, Inc. v. United States, 406 U.S. 1, 92 S. Ct. 1411, 31 L.Ed.2d 658 (1972), I think we are overreacting to our reversal therein, and respectfully, I dissent. I deny that we are required or even persuaded to dismiss by that decision. There is not present here the feature of unauthorized intermeddling by the GAO, causing prolonged delay though the contractor was willing to settle on the AEC determinations, including the ones adverse to it. This plainly aroused the ire of the Supreme Court majority—was its *bete noire*, as Justice Brennan said, dissenting, p. 62—more than any other feature of the case. The majority views about that are 180° at variance from ours that had regarded the legality of GAO intervention as irrelevant. Divided as the higher Court was, there is nothing in its decision to show how it would have reacted to a situation where, as here, the GAO played no role. Plaintiff rejected the "settlement" the Board proposed, thus assuring that the litigation was not at an end, in all events, and all defendant did was to file what would normally have been considered a perfectly routine counterclaim.

Our decision in S & E Contractors, Inc. v. United States, 433 F.2d 1373, 193 Ct.Cl. 355 (1970), reversed as above, did not write on a clean slate. We cited and followed Acme Process Equipment Co. v. United States, 347 F.2d 538, 171 Ct.Cl.

---

* Spector, Disputes Arising in Connection with Contract Performance—A Comment on the Report of the Commission on Government Procurement, 33 Fed.B.J. 160 (1974).

251 (1965); and C. J. Langenfelder. Co. & Son v. United States, 341 F.2d 600, 169 Ct.Cl. 465 (1965), both of which squarely and unanimously held that the defendant was not bound in Wunderlich review by adverse Board determinations. The difference was that in those cases the GAO played no part. Two of our judges joined in *Langenfelder,* who afterwards dissented in *S & E.* The two cases were of course not binding on the Supreme Court, as they were on us. Assuming, however, that the majority above agreed with our dissenters, in *S & E,* as may be inferred from the lengthy and approving quote by Mr. Justice Blackmun of our late Judge Collins at 21, fn. of 406 U.S., 92 S.Ct. at 1422, the fact our dissenters, two at least, gagged primarily at the GAO intervention, is also significant.

I should add for completeness that our dissenters in *S & E* referred to *Acme Process Equipment Co.,* and *Langenfelder.* Judge Collins said they were inconsistent with his views and should be overruled. Judge Skelton said they were distinguishable on the facts, but he would overrule them if in conflict with his opinion.

It seems to me, therefore, that we could limit the following of *S & E* to instances of GAO intervention, without doing violence to the Supreme Court's authority. We could treat *Acme Process Equipment* and *Langenfelder* as still. law, only limited, not discredited entirely, by *S & E.* The situation is, however, obviously fluid. Our responsibility is large. We are not told what to do. The Supreme Court, leaving so many questions unanswered, must have hoped we would be able to fashion new rules that would reconcile the various interests involved, with respect to situations that are only analogous or parallel to that in *S & E.* The rules we now announce should shorten litigation and favor settlement if they are to hold in check the evils that the Wunderlich Act, 41 U.S.C. §§ 321, 322, as construed by the Court,

was designed to guard against. In seeking to do this, Judge Davis's able and scholarly attack on the problem cannot be faulted as to purpose, but I find ominous his concession that the extreme positions of the parties would provide easier and simpler bases of adjudication than the middle line he proposes. We have all the expense, delay, and uncertainty in Wunderlich Act litigation that we need already, and must look with suspicion upon a line of future decisions that cannot but add to them.

That plaintiff's position, especially as stated by amicus National Security Industrial Association, is extreme, beyond a doubt. It is best explained by counsel's answer, in oral argument, that the Wunderlich Act procedure is unfair to the contractor, in its entirety, and needs to be corrected by a rule of litigation unfair to the Government. Defendant's position seemed to me result-oriented and to suggest several alternative grounds for decision, some of which would be extreme if adopted. In saying, however, that *S & E* does not enable a contractor to rely on and repudiate a Board "decision" simultaneously, defendant is thinking along the right track if not with sufficient refinement, and deserves more attention than it is receiving. The court does adopt the position in part, though not for application to the instant case.

We can, I think, agree that when a Board adjudicates a single, unitary "dispute", a contractor cannot bind the Government to parts of it that favor him, while rejecting and appealing the remainder. This would do nothing to mitigate the evils the Supreme Court took arms against, and is manifestly unfair. It would militate against the writing of honest and explicit Board decisions. It would become an Art to allow nothing favorable to a claimant to find its way into a decision adverse to him in its ultimate conclusion, to simply steamroller the party elected to lose. Moreover, it does not favor settlement, but encour-

ages further litigation, if a party can come into this court exposing to Wunderlich review only the parts of the resolution of a dispute unfavorable to him, while the favorable parts are and remain sacrosanct. This is a rule for the encouragement of litigation and the discouragement of efforts by Boards to settle and dispose of disputes in multifaceted cases, by resolving issues one by one for which ever party has the best case on that issue. The court is right about all this.

On the other hand, I am inclined to agree that the contractor's keeping open one "dispute" does not supply an excuse for the Government to litigate another "dispute" which should be deemed "settled" by *S & E* standards. One "decision" possibly may deal with more than one "dispute". The problem therefore is to determine whether a particular case or controversy is one "dispute" even if dealt with for convenience in a separate subsection of findings or an opinion. The court also recognizes this so I need not labor the point.

A single "dispute" may involve more than one contract, as in Gresham & Co. v. United States, 470 F.2d 542, 200 Ct. Cl. 97 (1972), involving fifteen. The Board adjudicated the one "dispute" in two decisions, but we dealt with all together and any reader of the opinion will agree there was but one "dispute". Conversely, more than one "dispute" may often arise under a single contract. However, the Board docketing of "disputes" as separate though under the same contract, must always be regarded with reserve. Thus in Liles Constr. Co. v. United States, 455 F.2d 527, 197 Ct. Cl. 164 (1972) the Board adjudicated two "disputes" rising from the same operative fact. The contracting officer had wrongfully ordered the prime contractor to cease employing the painting subcontractor. One "dispute" related to the prime's claim for reimbursement for the higher cost of employing a new subcontractor. The other "dispute" was as to the cost of settling with the original subcontractor for his wrongful ouster. They were really one "dispute". Though docketed separately these "disputes" were tried together by the Board and decided together by us. In our order in Dynalectron Corp. v. United States, 199 Ct.Cl. 996 (1972) it appears one "dispute" related to a default termination and the other to excess reprocurement costs resulting therefrom. It would seem we treated the docketing of those matters by the Board as two cases to be practically conclusive that these were two "disputes", though some minds might regard them as inextricably intertwined.

The court would go behind the docketing of cases by Boards and investigate the actual content of the "disputes" adjudicated. It must be admitted, the whimsical way issues get docketed as one case or several, gives support to the idea that it is not enough to look and see if one "decision" is reported, or several. On the other hand, the practice should work both ways and might well lead to the *Liles* and *Dynalectron* controversies being deemed each a single "dispute" despite the plural docketing. Once negotiation between contractor and Government has broken down, the contracting officer may lump everything together and make one decision, or issue several in sequence. In either case, the contractor must appeal within 30 days to save his rights. This leads to issues under the same contract dribbling into the Boards and being separately docketed. A piecemeal kind of litigation is apparently demanded by this procedure before the Boards, that courts in their area of cognizance would not tolerate. Boards may consolidate these bits and pieces of litigation, or they may not. I agree with Judge Davis that we cannot be bound in all cases by the extent of consolidation a Board has elected to employ.

The *Liles* case, *cit. supra,* illustrates also a class of dispute that cannot possibly be considered unitary with others.

After the two appeals, already mentioned, dealing with the unlawful termination of the painting subcontractor, came a third that dealt with alleged extra work ordered of the electrical subcontractor. Just as it is obvious to me, and I hope, to the court, that the first two issues are intertwined and are one "dispute" so it is equally obvious that the third issue is another "dispute". The electrical subcontractor in that issue clearly was the real party in interest, and he had no interest in the painters "dispute." Had the Board decision been in the electrical subcontractor's favor, it would have been a most unfair and unreasonable restriction of his *S & E* protection to hold that the resort to this court on the painting dispute opened up his favorable decision to review under a Government counterclaim. This establishes that it cannot always be right that a contractor appeal of part of any single "decision" opens up for counterclaim any portion of the same "decision" that the Government dislikes.

Judge Davis's illustration of issues under a construction contract relating to the building excavation and the painting of the corridor ceiling (p. 643, *ante*) is of course a good example of separate "disputes" if, as normally would be the case, separate subcontractors were involved, claiming through the prime. In the event, however, that separate subcontractors are not involved, the answer, one "dispute" or two, is by no means self-evident without further facts. The two issues might involve time extensions, and the extra times involved might have to be added to one another to determine if completion was timely. Issues relating to cellar and attic might be invoked as illustrating a course of arbitrary and unlawful rejections by the Government resident inspector. Put the painting outside, and Government caused delay to the basement might postpone painting the roof into the inclement winter season. When you are finished with entitlement and move on to quantum, the relationship of separate items of the claim to one another shifts and varies again.

My quarrel with the court's proposed way of distinguishing between one "dispute" and several is in part that it demands, in the person drawing the distinction in an actual case, a knowledge of the case not likely to be possessed by anyone who has not already adjudicated the case on the merits, or done as much work as if he had. Thus, I agree with and join in the court's decision in Northland Camps, Inc. v. United States, 499 F.2d 658, 204 Ct.Cl. —— (decided today) but I cannot help remarking that a complete Wunderlich Act review of all issues including the counterclaim, would have required no lengthier an opinion—it appears to be a simple case—and presumably no more work, yet as things are the Wunderlich Act review is still to be performed. In future cases, when the Government counterclaims, it will probably be better to consider simultaneously whether the Government can obtain review in face of *S & E*, and whether its contentions have merit in their substance. The latter issue being often easier, it will probably often be better to address it first, and if the Government is seen to have no case, to leave the *S & E* issue unaddressed.

This in fact the court has already done in Boeing Co. v. United States, 480 F.2d 854, 202 Ct.Cl. 315 (1973). The case involved Wunderlich Act review of a Board decision interpreting a number of contracts. The issue was the right of the contractor to allocate to its costs of performing Government contracts part of the state and local taxes assessed on commercial property. Different ASPR provisions and different contract clauses were applicable to different contracts, and the Board had distinguished among them, allowing the allocations as to some and not others. Both sides sought our review, defendant by counterclaim. Our trial judge refused to consider the counterclaim on *S & E* grounds. I would have regarded this as a single, unitary

"dispute" if ever there was one, despite the multiplicity of contracts. Others on the court having difficulties, we left the S & E issue to another day and all joined in holding that the counterclaim, even if allowable, lacked merit. Applying the criteria announced by Judge Davis, I am inclined to think we would now hold the case a single "dispute" but I am far from certain, because I do not know how he would balance his two sets ·of criteria. I would attach controlling weight to the evidently conscious decision of the parties and the Board to treat the issue procedurally as one "dispute".

I do not refer to the case to debate that issue now, but to show how much simpler the merits often are, than the S & E issue, and particularly when the court insists on deciding the latter the hard way. Defendant's counterclaims will not always so lack merit as to allow the by-passing of the S & E issue. The authors of the S & E decision I suppose hoped they were, if nothing else, at least contributing to economy of judicial manpower and that of the bar as well. Now it seems S & E is all we need to make a Jarndyce v. Jarndyce * out of some of our cases. It is always unsafe to predict what defendant will do. However, I foresee that conscientious Government counsel, applying the court's subjective criteria, will now believe it their duty to draft counterclaims and test their position in many cases where the Board has allocated rewards and punishments to both sides alike, and the contractor brings his wounds here for assuagement.

It now devolves on me to explain how I would avoid extreme positions and still apply S & E in a simple and rational way. I think the key is to respect and view as the primary factor the treatment of the controversy by the parties and the Board. If, as in the *Boeing* case, they have chosen to treat the controversy as one "dispute", that should be decisive. In fact, after these decisions appear, I would expect Boards themselves to make express findings whether they regard a controversy as one or several. Such findings, if supported by substantial evidence, should be deemed binding on us. If they do not so find expressly, we may imply findings from the way the cases are dealt with. Counsel will be aware of the legal consequences, and will not allow disparate matters to be tossed into one grab-bag, or allow what is really one simple "dispute" to be broken into several.

If the parties and the Board treat as related parts of one "dispute" what appears to be on its face an unrelated series of claim items, I would presume, if not irrebuttably, at least strongly, that they know what they are doing and a connection must be apparent in their minds even if not in ours. I would separate out any claim that appears on its face clearly severable, as e. g., one on behalf of a subcontractor not interested in the remainder of the claims in suit. There probably will with more experience emerge other issues of that kind. Absent them. I would presume the prosecution of · a series of claim items in a single proceeding, under one contract, occurs because the parties and the Board perceive a connection between them. Within the ordinary contract "dispute" a list of several claim items lists counters to be played on the same checker board. Such counters have a relationship in the minds of the players, and we do not always understand their play. The contractor wants the highest possible price, and thus there is no lack of connection in his mind between any two claim items that converge towards this end. Even when the issues are different, stated as abstract doctrine, it usually turns out that the claims overlap to some extent when the cost of satisfying them is computed. Unless they are in the special category noted above, or some other, they are connected. The

---

* An imaginary lawsuit, described by Charles Dickens in the novel "Bleak House," that bankrupted all the litigants.

court recognizes the treatment by the parties as a factor, but spoils this good work by allowing factors of a different kind to control. The effort of separating factors out along the "second category" suggested in the prevailing opinion is not only laborious and unrealistic, in my opinion, but sterile and conceptualistic too. The purpose of the Wunderlich Act being to encourage settlements without court litigation, the interpretation of the word "dispute" should be adopted which most encourages and facilitates settlement. This is, I submit, the interpretation that includes in one "dispute" claim items that counsel would ordinarily discuss together in settlement negotiations and trade off one against the other, according to each side the benefit of its strongest points, and each surrendering its weakest.

Parties litigate for money, not for concepts. In the case before us, it appears to me that the plaintiff's claim for $144,065 as dealt with in Part I is, in life, a trading for the same money as defendant's claim of an alleged overpayment, dealt with in Part II, and is one "dispute". The outcome, which leaves the Board decision standing in toto, and both reachings struck down, is perhaps not unfair. If we had accorded more respect to plaintiff's claim, the silencing of the counterclaims would in my view display all the unfairness so eloquently dealt with in Subpart IIA, of the court's opinion, and it is not perceived only because of the conceptualistic dogma that a multiplicity of stated claim items necessarily imports a multiplicity of "disputes". The mistake seems to be the unstated but felt idea that a single "dispute" requires the parties to make diametrically opposing contentions respecting a single issue, whereas trying for the same money by contentions that do not meet and join are not one "dispute" but two or more. I differ.

Our practical problem, if I am right so far, will be in the cases decided below

before the present date, when it was not realized that the way the parties dealt with issues might control application of *S & E*. Thus the mere happenstance previous history of cases has allowed disparate issues to be thrown into one grab-bag and closely related issues to be dealt with separately. To a limited extent I would reform or restructure such proceedings to reflect their true nature. In Board cases after the present date, this would normally not be necessary because the Boards should henceforward identify separate "disputes" and deal with them accordingly. In some few cases their error might be so gross as to constitute abuse of discretion, but normally their structuring of the "disputes" before them should guide us and relieve us from our difficulties. It is so, I believe, here.

Thus my objection to the application of the *S & E* decision announced by the majority is that it requires a sterile and conceptualistic analysis of "laundry lists" of separate claim items, as commonly found, particularly in construction contract disputes, and a classification of such claim items as one or several "disputes" possibly contrary to the perception of relationship the parties themselves entertain. So far as it puts into separate "disputes" items that would normally be traded off against one another in bona fide negotiation, such classification will discourage honest, candid Board decisions, discourage settlement on the basis of Board decisions, and encourage the prolongation of litigation and the multiplication of Jarndyce v. Jarndyce situations.

In my judgment the plaintiff in the case before us put forward its claim respecting Modification 47 in good faith, no doubt, but still as a counter to trade with, and having put it in play, I think it should be deemed to have also put in play all the other counters still on the board.