## A. B. G. INSTRUMENT & ENGINEERING, INC.

v.

## The UNITED STATES.

No. 48–76.

United States Court of Claims.

Feb. 21, 1979.

Stuart R. Mandel, Beverly Hills, Cal., atty. of record, for plaintiff.

Stephen G. Anderson, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Richard J. Webber, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUN-ZIG, Judges.

PER CURIAM:

This case comes before the court on plaintiff's request, filed June 8, 1978, for review by the court of the recommended decision of Trial Judge John P. Wiese, filed January 27, 1978, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that the decision of the ASBCA determining that the contractor was entitled to an equitable adjustment because of the Government's imposition of a 100 percent inspection requirement is erroneous as a matter of law

and must be reversed. In all other respects, however, the board's decision was correct and is entitled to finality. Accordingly, defendant's cross-motion for summary judgment is granted; plaintiff's motion for summary judgment is denied; and, the petition is dismissed.

## OPINION OF TRIAL JUDGE

WIESE, Trial Judge: This case is before the court on cross-motions for summary judgment. At issue is the finality, under Wunderlich Act standards,[1] of a decision of the Armed Services Board of Contract Appeals (the board) upholding the Government's default termination of plaintiff's contract for failures in delivery.[2] In this proceeding it is claimed that the board's decision is not supported by substantial evidence and is in error on matters of law. Defendant denies these contentions insofar as they relate to the principal issue on appeal, i. e., the correctness of the default termination. However, with regard to a subordinate point which the board had resolved in plaintiff's favor and for which it had held the contractor was due an equitable adjustment (the issue involved the Government's imposition of a 100 percent inspection requirement), defendant claims the decision was erroneous and, on this limited point, should be reversed. The court agrees with defendant's contentions.

## I. Facts

On September 23, 1968, the Navy Ships Parts Control Center at Mechanicsburg, Pennsylvania, awarded plaintiff a fixed-price contract for the manufacture and delivery of 720,000 nose fuze adapters (an artillery shell component) to be shipped in monthly increments of 60,000 units beginning January 21, 1969. During the life of the contract (it was terminated by the Government on December 12, 1969), the specified monthly shipping rate was never achieved. At the start there were difficulties in obtaining delivery of raw materials

due, apparently, to adverse weather conditions. The Government recognized this to be an excusable cause of delay and, by contract modification, agreed to a stretch-out of the delivery schedule and to a corresponding reduction in the monthly shipping quantity to 40,000 units. However, for a number of reasons, some of which are raised as issues in this appeal, this revised production schedule also proved to be beyond the contractor's ability to attain. Through July 18, 1969—the issuance date of the second of three show cause letters—the accumulated delinquencies in delivery exceeded 150,000 units.

Notwithstanding this state of affairs, the Government remained willing to continue the contract provided a realistic shipping schedule could be worked out. This too never came about. The events that finally brought matters to an end (and with which this appeal is thus chiefly concerned) began with the Government's inspection and rejection of two lots of approximately 20,000 units each, lots 10 and 11, which had been shipped by rail, F.O.B. Destination, from the contractor's plant on July 2, 1969 (lot 10) and July 25, 1969 (lot 11). Upon their arrival at the Government's receiving facility, it was found, in each case, that the load had shifted in transit, that some of the shipping cartons had opened and that their contents had been strewn about the railroad car. The units, which had previously been sample inspected by the Government at the contractor's plant (but not then accepted), were now reinspected and rejected. Later, upon the request of the contractor's president and in his presence, the Government again inspected the two lots and again rejected them. After this time, there were no further shipments made by the contractor for reasons which, like the inspections of lots 10 and 11, relate to matters in controversy.

A third and final show cause letter was issued by the Government on September 17, 1969. From that point on, the inability to

1. The statutory reference is: 41 U.S.C. §§ 321–22 (1970).

2. The decision on appeal is: ABG Instrument & Engineering, Inc., ASBCA No. 14980, 74–2 BCA ¶ 10,689.

resolve the differences between them finally led to the Government's default termination of plaintiff's contract on December 12, 1969. The basis for this action, as given in the Government's notice of termination, was the contractor's "having so failed to make satisfactory progress as to endanger the delivery of 232,510 units or any unshipped portion of the \* \* \* quantity called for \* \* \* in accordance with the delivery schedule \* \* \*."

## II. Discussion

Against the brief background sketched above we turn now to an examination of the several issues presented on appeal. Each of the issues to be discussed offers what the contractor sees as a separate basis for invalidation of the default termination. For the sake of simplifying their presentation, the various points raised shall be dealt with under separate subject matter headings; additional facts, where necessary, shall be presented in the context of the discussion of each issue.

A. *The Inspection Standard Applied to Lots 10 and 11.* The first matter raised by the contractor concerns the size of the samples upon which the Government had based its rejections of the two lots in question. As noted, lots 10 and 11 consisted of roughly 20,000 units each—quantities which, under the terms of the contractually-specified sampling procedures,[3] should have called for the random selection of 315 samples, each to be tested for conformance with contract requirements on four specified major characteristics and 22 specified minor characteristics. However, when the Government carried out its acceptance inspections of lots 10 and 11, on neither occasion then did it rely on more than a 20-unit sample. The contractor says that this was

plainly contrary to the contract requirements and that the board was wrong in permitting the inspections to stand. A subordinate issue which surfaces in the contractor's brief is the fact that, in the first acceptance tests of lots 10 and 11, the Government inspectors not only used the smaller size sample but also adhered to a different inspection standard—one which the contract had specifically stated should not constitute a contractual requirement. In this too the board saw no actionable transgression by the Government.[4]

The board's decision is right on both points. At best, it is irrelevant that the Government relied on a 20-unit sample rather than one of 315 units. Under the contract's inspection standards, the Government was entitled to randomly select its samples and if, as happened here, enough defects were found among the 20 units so chosen to disqualify the entire lot, it surely does not matter that the sample size was less than it might have been. Certainly the contractor was not prejudiced by the smaller sample. Indeed, given the results that that sample produced, it is a fair bet that a larger ⸱ample would have revealed an even greater number of disqualifying defects. But even if, by chance, that were not to have happened, it would not alter matters any. The controlling fact is that the 20 pieces that were examined were evaluated against the contractually-specified acceptance-rejection standards applicable to a 315-unit sample and, in the light of that criterion, revealed, *in toto,* a sufficient number of defects to warrant rejection of the entire lot from which they had been drawn.

As to the point concerning the erroneous inspection standard, it is not at all clear how, apart from specifying different sample sizes and different acceptance-rejection numbers, this standard differed from the

3. The contract's "Inspection and Acceptance" provisions specified that the sample size should be in accordance with MIL–STD–105, Level II. Under this criterion, lots ranging in quantity from 10,001 to 35,000 pieces, required a sample size of 315 pieces.

4. It is not clear from plaintiff's brief whether the court is also being asked to invalidate the

rejection of lots 10 and 11 because of the Government's application of a different inspection standard at the time of the initial acceptance examination. Although the point is raised and emphasized, it is not further developed. However, for the sake of economy, the opinion addresses this point as well.

inspection standard called for in the contract. For example, the board specifically bound—and this point is not now challenged—that the characteristics addressed in the first inspection were exactly the same as those addressed in the second inspection. At any rate, the important point is there was a second inspection and that, apart from the sample size (the point discussed above), this second inspection was in full compliance with all contractual requirements. So too was the rejection that it led to—the point next discussed.

B. *The Rejection of Lots 10 and 11.* The contractor's second contention is that the results of the follow-up inspection of lots 10 and 11 (the second inspection), when properly evaluated, lead to the conclusion that rejection of the lots was wrong. The argument centers, first of all, on what is said to be a contradiction in the board's decision. The claim is that the board, on the one hand, had held that items damaged in transit were to be excluded from the inspection results and, on the other hand, had permitted such damaged parts to be included among the defects that were counted in the Government's second rejection of the lots in question.

■ The argument is without merit; it is based on a misreading of the board's decision. To begin with, the board did *not* say that items damaged in transit were to be excluded from those to be inspected. Defects in the product shipped, whether due to transit damage or to shortcomings in the manufacturing process, were clearly within the contractor's area of responsibility. The board said no less.[5] The board also made the observation—and this is the point plaintiff misconstrues—that because of the Government's mishandling at destination of some of the adapters (specifically, those that had been found strewn about the railroad car which, as the evidence showed, had been immediately shoveled into containers by the Government's agents without prior

inspection), it would be impossible to say with assurance whether damage to such a unit was due to manufacturing deficiency, to transit or to the manner of its removal and storage. But this observation by the board had only to do with the *extent* of transit damage—nothing more. The point the board was making was that if the Government had inspected the adapters prior to their removal, that alone might have revealed sufficient defects, originating either through transit damage or at origin, for rejection of the entire lot. At the same time, however, the board's opinion also makes it clear that none of the units potentially damaged by the Government's removal and storage methods were involved in the second inspection. Rather, the rejection was based on a screening of samples that were taken from unopened cartons. And, whatever defects these particular samples revealed, whether related to manufacturing deficiencies or to transit damage, they were properly assigned to the contractor. There was no contradiction or inconsistency in the board's treatment of damaged items.

The other point plaintiff makes is that the board should not have upheld the sufficiency of the second rejection because that inspection included, in its tally of defects which led to the disqualification of the two lots, certain characteristics ordinarily measured before "parkerizing," *i. e.,* before the application of a final phosphate coating. The claim is that, in this instance, the tests were conducted after the final coating had been applied and that there was no evidence to indicate that the crystallization associated with the phosphate coating was removed before inspection (as it should have been) or that the recommended lubricant was applied to the gauges used in the inspection. The contention is that adherence to proper procedures would have reduced the number of characteristics scored as defects.

5. On this point the board's opinion provides: "In our consideration of whether either lot was rejectable under the standards set forth in the contract, we consider the damage sustained in transit to be available for consideration in de-

termining whether the lot was within the quality level permitted by the contract. However construed, the instrument before us cast upon the appellant the peril of damage in transit." 74–2 BCA at 50,843.

This argument is also wide of the mark. On this very point the board had said: * * * Recognizing that the GO–NO–GO gauging defects may be attributable to parkerizing and therefore be excludable from scoring as a defect, we hold that the other defects in Lots 10 and 11, whether the result of faulty manufacturing or damage in transit, were sufficient in number to allow rejection of each lot under the AQL [acceptable quality level] set forth in the contract. Therefore, we find the rejection of Lots 10 and 11 to have been proper. [74–2 BCA at 50,844.]

In light of the above, it is obvious that the allegations here made—that parkerizing affected the credibility of the inspection results and hence, the validity of the rejection of lots 10 and 11—are without foundation in fact. The board found that even with all possibly spurious defects put aside, the defects remaining were sufficient in number to justify rejection. Plaintiff does not say otherwise.

Equally unpersuasive is the further argument plaintiff has raised concerning the absence of evidence to show that the inspection had been carried out with due regard to proper test procedures. Plaintiff's president was present at the time of, and participated in, the second inspection; he, in fact, supplied the gauges that were then used. Likewise, he was also a witness in the hearing of this matter before the board. Given these circumstances, the want of evidence now complained surely does not support an inference against the Government. Indeed, if an inference is warranted at all, it must be that proper test procedures had, in fact, been followed. If the facts were really otherwise opportunity to correct this error, or at least to point it out, was twice presented to plaintiff—first at the time of actual testing and later at the time of trial. However, as the argument itself notes, the record is altogether silent on this score.

C. *The Government's Right to Reinspect.* A third issue raised by plaintiff in this appeal involves the contention that the Government was contractually out-of-bounds when it undertook to reinspect lots 10 and 11 upon their arrival at destination. In support of this argument, it is pointed out, first of all, that the contract fixed the place of inspection at the contractor's facility. And, in keeping with this requirement, it is also claimed that all the adapters which comprised lots 10 and 11 had been thoroughly sample-tested by the Government and were shipped to the using destination only after having been found to be in full compliance with the quality assurance provisions of the contract. Thus, argues plaintiff, as a matter both of law and fact, the Government should not be permitted to rely upon the results of what is now claimed to have been an impermissible second inspection.

As was the case with plaintiff's other arguments, this argument too must be rejected. To begin with, plaintiff is not correct in claiming that the adapters had been thoroughly sample-tested by the Government prior to shipment—quite the opposite is true. The pertinent exhibit reveals that, on lot 10, no more than 72 pieces had been examined immediately prior to shipment while, on lot 11, only 25 pieces were then examined. Furthermore, these inspections were only spot examinations, that is to say, not all the units then examined were checked to determine their conformance with all the characteristics that each would eventually be required to satisfy.

Aside from the factual error in its argument, plaintiff is also wrong in its legal position. While the contract does specify, as plaintiff contends, that inspections by the Government were to be carried out at the contractor's plant, it also said, with like clarity, that "[a]cceptance of such supplies shall be made at destination by the receiving activity * * *." And, it further provided that deliveries to the Government were to be "F.O.B. Destination"—a provision which the board correctly observed "cast upon the appellant the peril of damage in transit."[6] 74–2 BCA at 50,843.

---

6. In reaching this conclusion, the board obviously had in mind Section 2–319(b) of the Uniform Commercial Code which says that "when the term is F.O.B. the place of destination, the

Given these two provisions—shipment at the seller's risk and acceptance at point of destination—it is obvious that the Government did not contractually bind itself to a situation whereby its origin inspections would preempt its right to reject nonconforming goods upon their later tender. Indeed, to put it more explicitly, the accommodation of the Government's right to accept or to reject supplies at destination necessarily implies that the Government should also have the right to reinspect those supplies at that time.

The same result is also contemplated by the terms of the inspection clause which was incorporated into the contract by reference, namely, paragraph 5 of the standard supply contract's general provisions (Standard Form 32, June 1964 edition). That provision makes it clear that, with the exception of latent defects and instances of fraud or gross mistake, it is *acceptance* that binds the Government and not the results of any of its earlier inspections.[7] More in point, it acknowledges the Government's right to conduct reinspections for it expressly states that *"[t]he inspection and test by the Government of any supplies or lots * * * does not relieve the Contractor from any responsibility regarding defects * * * which may be discovered prior to acceptance."* (Emphasis supplied.) 32 C.F.R. § 7.103–5(d) (1976).

D. *The Government's Conduct Following Rejection of Lots 10 and 11—Imposition of a 100% Inspection Requirement and Threatened Suspension of Further In-Process Inspections.* Following the rejections of lots 10 and 11, efforts were initiated by the contractor to have the Government accept the rejected parts at a reduced price. When these efforts eventually failed, the resulting financial squeeze upon the contractor made further production impossible. In the meantime, however, production had been continued and out of this there arose other problems which also adversely affected plaintiff's performance. These began on August 6, 1969. On that date, the Government conducted an in-process inspection of adapters that were then slated to become part of shipping lot 12. In a random sample of 72 units, all drawn from a lot that had previously passed plaintiff's own inspection and acceptance procedures, the Government's inspector found only 5 acceptable adapters—67 units out of the 72 then examined showed disqualifying defects. Immediate corrective action was ordered by the Government including a requirement specifying 100 percent inspection, which meant, in this instance that, in lieu of random sampling, the contractor would now have to examine each adapter in the rejected lot as to those particular characteristics which the Government's inspection had found defective. At this time the contractor was also advised that acceptance of the present lot, as well as future lots,

---

seller must at his own expense and risk transport the goods to that place and there tender delivery of them * * *."

7. The reference here is to the standard Inspection clause, paragraph 5(c), which reads in full as follows: "(c) If any inspection or test is made by the Government on the premises of the Contractor or a subcontractor, the Contractor without additional charge shall provide all reasonable facilities and assistance for the safety and convenience of the Government inspectors in the performance of their duties. If Government inspection or test is made at a point other than the premises of the Contractor or a subcontractor, it shall be at the expense of the Government except as otherwise provided in this contract; *Provided,* That in case of rejection the Government shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. The Government reserves the right to charge to the Contractor any additional cost of Government inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor or when reinspection or retest is necessitated by prior rejection. *Acceptance or rejection of the supplies shall be made as promptly as practicable after delivery,* except as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor." (Emphasis supplied.) 32 C.F.R. § 7.103–5(c) (1976).

would be withheld until adherence to proper in-house inspection procedures had been demonstrated.

One week later, the Government conducted a follow-up in-process inspection. The results, however, offered it little encouragement to believe the contractor had done much to better in-house inspection procedures. For example, on the first day of the follow-up inspection (August 12, 1969) 72 adapters were examined and, of these, 31 were rejected. The next day, 30 adapters were examined and, in this group, 6 rejects were uncovered. This time the Government responded to the situation by informing the contractor that further inspections would be withheld until all ordered corrective actions had been taken. The Government's letter on this subject reads, in part, as follows:

* * * due to the lack of controls exercised, and the apparent lack of concern to initiate and conform to any documented corrective action; inspection and acceptance is hereby withheld until adequate and completely documented controls are proven by your staff to be competent and effective.

On August 20, 1969, the contractor responded, in writing, to the Government's twice-repeated insistence that corrective steps be taken to insure a more reliable in-house inspection arrangement. This letter did not contest the need for corrective action; in fact, it pointed out several steps that were then being taken to remedy the situation. Thereafter, the Government conducted two further inspections—an in-process inspection on September 8, 1969, and a final inspection on October 17, 1969.[8] Neither inspection gave hint of any improvement in the quality of the contractor's own inspection. The Government's September 8th inspection revealed 70 defective units out of a random sampling of 137 units; the October 17th inspection (which, like the August 6th inspection involved adapters purportedly ready for shipment) revealed 102 defective units in a sample lot of 200 pieces. At this point, the Government again called for 100 percent reinspection on each of the 9 (out of 11) separate characteristics that had been found to be deficient among one or more of the 200 units that had been checked. After this event, so far as the record shows, there was no further production.

Upon the facts recited above, the board concluded that the Government was wrong in imposing a 100 percent inspection requirement upon the contractor and that, for the additional costs which that requirement had occasioned, the contractor was due an equitable adjustment. It rejected, however, the contractor's related argument— raised again in this appeal—that the 100 percent inspection requirement excused the contractor from further performance and thereby invalidated the default termination. The board also rejected, on factual grounds, the further contention that it was the Government's refusal to continue inspection which had caused production to come to a halt. This last argument is also urged again in this proceeding. The Government answers these renewed arguments by saying that the board was correct, legally as well as factually, in refusing to overturn the default termination either because of the 100 percent inspection requirement or because of the claimed discontinuance of inspection by the Government. However, the Government also makes the argument that the board misread the contract when it granted plaintiff an equitable adjustment because of the Government's requirement for 100 percent inspection. As to this part of the board's decision then, the Government says the court can, and should, reverse.

The Government's arguments are well taken. In concluding that the Government was not entitled to insist upon a 100 percent inspection requirement, the board seems to

8. The testimony establishes that the Government inspector also visited plaintiff's plant on October 7, 1969. Whether an inspection was also carried out at this time is not made clear in the record.

have relied[9] upon those sections of the applicable specification, MIL–STD–105D, which recited the conditions under which tightened Government inspection, and subsequently, discontinuation of Government inspection, were warranted. These sections, as the Government's brief points out, have nothing to do with the issue. Tightened inspection and discontinuation of inspection bear upon the procedures that the Government must adhere to its own inspection procedure; as such they do not at all address the inspection procedures that *the contractor* can be compelled to follow after the Government's own inspection procedures have led to the rejection of a lot. This latter situation is addressed in paragraph 6.4 of the applicable specification which reads in full as follows:

6.4 RESUBMITTED LOTS OR BATCHES. Lots or batches found unacceptable shall be resubmitted for reinspection only after all units are re-examined or retested and all defective units are removed or defects corrected. The responsible authority shall determine whether normal or tightened inspection shall be used, and whether reinspection shall include all types or classes of defects or for the particular types or classes of defects which caused initial rejection.

■ Given the above-quoted language, there can be no basis for upholding the board's allowance of an equitable adjustment. The contractor was required to do no more than what the contract called for—to reexamine all adapters in the batches found defective for the particular types of defects which had caused the initial rejection.

■ The Government is also on sound ground in saying that the court is free to reverse the board's decision on the point in issue: the rule which accords finality to contract disputes administratively resolved in a contractor's favor, *S&E Contractors, Inc. v. United States,* 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972), prevails only so long as the contractor does not seek further review on that dispute. *Roscoe-Ajax Constr. Co. v. United States,* 499 F.2d 639, 204 Ct.Cl. 726 (1974). That condition has not been met here. Since it was the contractor who raised the 100 percent inspection issue in this court, the board's treatment of that issue—to the extent it was favorable to the contractor—is now open to Government attack as well. In reaching this conclusion it is not necessary to decide whether the issue in contention is in and of itself a contract "dispute" (in the sense in which that term is defined in *Roscoe-Ajax*); it is enough to point out that the parties have focused their attack on the same operative fact—the requirement for 100 percent inspection. In this circumstance, it is a foregone conclusion that the contractor may not attack the board's decision on the ground that the relief allowed did not go far enough and at the same time preclude the Government from showing that that relief went too far. The board's decision is wrong and must be reversed. The contractor is not due an equitable adjustment.

As to the contractor's other contention—that it was the Government's refusal to continue inspections which forced the halt in production—this too has no merit. To begin with, the contractor misreads the board's decision in claiming that the board had found "that defendant did refuse to inspect." The board made no such finding and, on this record, no finding to that effect could possibly have been made. (The facts earlier recited in this opinion show that there were at least two further inspections conducted by the Government *after* it had threatened to discontinue inspection on August 14, 1969.[10]) What the board did con-

---

9. The precise basis for the board's allowance of the equitable adjustment is not made clear in the opinion.

10. In fairness to plaintiff, it should be noted that, in its treatment of this issue, the board's opinion injects a confusing crossover between the Government's imposition of a 100 percent inspection requirement and the Government's intention to suspend inspection. The board apparently saw these actions as simultaneous in time. They were not. The Government's first imposition of a 100 percent inspection requirement occurred on August 6, 1969, and at that time the contractor was also advised that ac-

clude was that, while the Government was not entitled to threaten discontinuation of inspection, that event had no bearing upon the contractor's halt in production. On this point, the board's opinion states "that [it was] appellant's marginal financial condition [which] was severely inhibiting performance and was the cause of appellant's inability to continue." 74–2 BCA at 50,844.

On the factual conclusion that it reached, the board was correct.[11] Though it is said now that the contractor had the financial resources to continue performance, albeit at a lowered monthly production rate, the evidence that is offered for this purpose is far from convincing. The reference is to a letter addressed to the contracting officer, dated October 6, 1969, in which the contractor had stated that "[w]e are able to produce 30,000 units per month, under the present financial condition." This letter, or more specifically the language quoted, is said to establish that the contractor could, and would, have been able to continue production had the Government remained willing to continue final inspections.

The argument proceeds upon a false note for it ignores the fact that the same letter had also pointed out that, because of the rejection of the two lots and the resulting non-payment, the contractor was not in a position to pay its material supplier and production had therefore stopped. On these points, the letter reads as follows:

> The Finance Office rejected our billing on these two shipments. This created a hardship for us. We have produced an additional 28,000 parts—but production has now been stopped. Our material supplier will not ship us until they receive payment—this we cannot do. We could start manufacturing if we could resolve a

waiver for minor discrepancies. We offer a 5% consideration or $1,847.06 for the total amount of both shipments of $36,-941.10.

Plainly, the full sense of the situation is that the contractor could have produced 30,000 units per month if the Government were to accept lots 10 and 11 at the reduced prices that had been offered. That, however, never came about.

Nor is any different reading of this letter suggested by the contractor's testimony before the board. In response to a question asking whether the Government's failure to pay for lots 10 and 11 had had any effect on production capacity, the answers given were that "[i]t had a definite, immediate financial effect" because "[i]t was almost $40,000 operating capital out the window." And, when asked whether this, in turn, had led to difficulty in the meeting of the payroll, the answer given was "[y]es."

The board's decision determining that financial difficulties were the cause of the contractor's halt in production is a determination that rests on substantial evidence.

E. *Waiver of Delivery Schedule.* The contractor's next contention is that, pursuant to this court's decision in *De Vito v. United States,* 413 F.2d 1147, 188 Ct.Cl. 979 (1969), the Government may not terminate for default where, as here, it has waived the contract's delivery schedule and, at the time of termination, no other enforceable delivery schedule is in existence. The board rejected this argument; the court does also.

The *De Vito* decision has no application to the facts of this case. That decision addresses itself only to the situation where the Government's forbearance from press-

---

ceptance of lots would be withheld until corrective action was implemented. The Government's decision to withhold *inspection*, as well as acceptance (a decision which, in fact, was never adhered to), did not come about until August 14, 1969.

11. This should not be read to mean that the court also endorses the board's statement that

the Government was not entitled to suspend its own inspections. As noted, that observation by the board was not a factor in its decision and therefore requires no further discussion in this opinion.

ing its right to demand timely delivery is coupled with continued performance on the contractor's part. In these so-called "waiver-after-breach" situations, it is the contractor's reliance that counts rather than the Government's failure to have insisted upon strict adherence to the terms of the delivery schedule. There was no reliance in this case. The Government's final show cause letter was issued on September 17, 1969; as of October 6, 1969, the contractor's production had ceased altogether and was never thereafter revived.

Additionally, it should also be pointed out that the default termination in this case was not for failure to deliver, rather, it was for failure "to make satisfactory progress [so] as to endanger the delivery" of the quantities remaining to be shipped. In appropriate cases, the distinction between these two grounds for default can be important for *Universal Fiberglass Corp. v. United States*, 537 F.2d 393, 210 Ct.Cl. 206 (1976), makes it clear that the Government may condone non-delivery without, at the same time, yielding its right to insist upon a demonstration of progress toward contract goals. Of course, in this case, where performance was abandoned altogether, the differences become academic; under either heading the Government's default termination would be proper.

■ F.  *Use of Certain Equipment.* Another argument raised below and renewed again here is the claim that the Government required the contractor to use certain equipment—six-spindle automatic chuckers—in order to qualify for the contract award. These machines did not perform adequately and the claim is that if the contractor had been permitted to use the equipment that had been planned for the job, both the quality and the quantity of its production would have benefited greatly. Since it was denied the opportunity to use equipment of its own choice (according to plaintiff's argument, that is), the delays in delivery that came about should likewise be considered to be beyond the contractor's control and not occasioned by his fault or negligence.

That the Government did specify the requirement for the six-spindle machines is clear from the evidence. But, it is also clear that this was not a matter of whim or caprice on its part. At the time of the pre-award survey, the contractor did not have in-house all the equipment that it had initially planned to use. Missing then from the catalog of necessary equipment was a certain automatic machine which the contractor intended to purchase from Switzerland. However, no purchase order had been placed for this equipment, nor was the Government provided with any of the specifications or details relevant to this equipment. Understandably, the Government could not approve the contractor for award in the absence of all necessary equipment. Indeed, it did postpone making the award until it was assured that six-spindle chuckers had been purchased. Nevertheless, the fact that the Government had insisted upon these machines, in lieu of accepting the contractor's choice of equipment, was apparently not a matter of much concern to the contractor at the time. Shortly before award of the contract, the contractor had occasion to write saying:

> The fact that most of your technical people suggest the use of six-Spindle machinery does not disturb our plans because if it becomes necessary we will immediately use two New Britain six-spindle Chuckers. In addition we are ordering an Automatic Chucker from Switzerland, the purchasing is in progress at this time.

As things turned out, the Swiss machine was never delivered (it apparently had been sold to another buyer) and the six-spindle chuckers which the contractor acquired (used equipment) required much rehabilitation and maintenance. The Government, it should be noted, had no hand in the contractor's selection of the particular chuckers that were purchased. On these facts, the board ruled as follows:

> * * * The evidence is clear that appellant acceded to the demand that it secure the machines in question because it needed this contract in order to survive as a company. That the machines failed to

function as contemplated is something not chargeable to the respondent. We find that the failure of the machines is not an excusable cause of delay. [74–2 BCA at 50,844.]

The contractor's problems in this case were caused by the quality of the machinery that it purchased and also perhaps by the failure to obtain the imported machine. Since neither of these problems was of the Government's making, the Government cannot be shouldered with the difficulties they created.

G. *Government Use of Rejected Adapters.* After the rejections of lots 10 and 11, the Government twice requested disposition instructions from the contractor. These instructions were never given. Thereafter, the rejected adapters were placed in storage. More than one year following the rejections, approximately October 1970, the Government began to use the adapters. This use was continued for over a year and, in that time, approximately 35,000 (out of the roughly 40,000 units that had comprised lots 10 and 11) were shipped. Of the circumstances under which this use came about little is known save that the units shipped had been marked condition "A"—a designation that would normally indicate that they were considered ready for use. However, it is not known whether this designation came about by inadvertence, that is, without knowledge of the original source of the adapters or perhaps even without the benefit of any later inspections. Nor, for that matter, does the record offer any basis for assuming that the adapters were used in conjunction with live ammunition or, if so, that they then performed satisfactorily.

On these facts, the contractor argued before the board that use of the adapters was inconsistent with the earlier rejections; that there was, in fact, an acceptance of the adapters and that, as a consequence, the default termination was improper. The board did not agree with this argument. It recognized that the contractor was entitled to payment for the adapters (a point which the Government had conceded) but, on the contractor's main argument, the board concluded that the Government's "right to terminate must be judged as of the date of termination." 74–2 BCA at 50,845. The argument made here is that the board committed legal error. Additionally, there is also presented the argument that if the Government's use of the adapters did not give rise to an acceptance under the contract, then the court should consider the same set of facts as the equivalent of a taking of property. Under this view of the matter, so the argument goes, the contractor would be entitled to further payment: to interest (measured from the dates that the adapters were used until the payment for them was received in March 1976), and to the reimbursement of attorney's fees and expenses.

■ The board was correct in its disposition of this issue—the Government's use of the adapters more than one year after their rightful rejection does not constitute an acceptance under the contract. Neither does it represent a taking of property in the constitutional sense of that term.

Three considerations shape this result. First, it cannot be questioned that the Government's rejections were proper: the adapters that comprised lots 10 and 11 failed to meet the contractually-specified acceptance criteria and the contractor had notice of these results immediately. (That the adapters, notwithstanding their rejections, could still be found useful to the Government does not, of course, disparage the validity of the rejections for, the Government no less than any other buyer, is entitled to a product that meets contract requirements; not one that simply proves to be adaptable for the purposes intended despite its deficiencies.) Second, that the adapters were not returned to the contractor was not due to any lack of effort on the Government's part, it was the contractor's failure to provide requested shipping instructions that brought that about. Third, the Government did not use the adapters immediately after their rejection. They remained in storage for over a year and during all that time, so far as this record shows, the contractor made no effort to secure their return.

Given these conditions—rightful rejection, absence of disposition instructions and storage for a reasonable period of time—the Government's later use of the adapters cannot be translated either into an acceptance or a taking. Rather, that action by the Government amounted to nothing more than a self-help procedure prompted by and entirely reasonable under the circumstances. Article 2 of the Uniform Commercial Code offers the same answer. Section 2–604 of the Code states, in relevant part, that "if the seller gives no instructions within a reasonable time after notification of rejection the buyer may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account * * *. Such action is not acceptance or conversion." The comment to this section further explains: "This section is designed to accord all reasonable leeway to a rightfully rejecting buyer acting in good faith. The listing of what the buyer may do in the absence of instructions from the seller is intended to be not exhaustive but merely illustrative."

The Code's purpose is obvious and fully answers the argument plaintiff has raised here: it would be intolerable to suggest that the Government (or, for that matter, any other buyer) could be forced to maintain goods in storage (in order to avoid the risks of an unintended acceptance or conversion) simply because of the defaulting seller's refusal to provide disposition instructions. And it would be equally extreme to suggest that, following a reasonable period of storage, the Government would be free to dispose of the adapters as scrap but not be free to salvage those among them that might be useful.

The contractor, having been paid the contract price free of any off-setting storage charges, is entitled to no more.

### III.  CONCLUSION

The board's decision determining that the contractor was entitled to an equitable adjustment because of the Government's imposition of a 100 percent inspection requirement is erroneous as a matter of law and must be reversed. In all other respects, however, the board's decision was correct and is entitled to finality. Defendant's cross-motion for summary judgment is granted. The contractor's motion for summary judgment is therefore denied and the petition is dismissed.