JACK R. MILLER, Senior Circuit Judge.
 

 This is an appeal by Cascade Pacific International (“CPI”), from a decision of the General Services Administration Board of Contract Appeals under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (1982) (“CDA”), upholding the Contracting Officer’s decisions to default terminate the subject contract and to grant in part the
 
 *289
 
 Government’s claim for breach of contract damages. We affirm.
 

 The issues on appeal are (1) whether the board’s denial of CPI’s claim that the General Services Administration wrongfully terminated its contract for default is supported by substantial evidence, (2) whether the board properly concluded that the Government was entitled to damages for CPI’s breach of the contract, and (3) whether the board’s assessment of damages incurred as a result of CPI’s breach denied CPI its due process right to adequate notice of the assessment imposed upon it.
 

 BACKGROUND
 
 [1]
 

 CPI entered into a one-year fixed-price supply requirements contract with the General Services Administration (“GSA”) for builders’ hardware (GS-04S-23598) (“ ’598”), including full surface and half surface spring hinges, on July 1, 1980. The contract prices per pair of full surface spring hinges ranged from $2,125 to $2,585, and those for half surface spring hinges ranged from $2,485 to $2,545. The specification indicated that the spring hinges were required to conform to Federal Specification FF-H-116E, which mandated,
 
 inter alia,
 
 that the spring hinges be plated and have a US10 finish,
 
 [2]
 
 that the thickness of the metal be 0.082 +/-0.005 inches, and that the spring hinges have button tips.
 

 The contract also contained the standard Inspection and Default clauses, Standard Form 32, April 1975 Revision. Under the contract, the spring hinges were to be submitted for inspection and testing within forty-five days after receipt of an order, before delivery, but the contract language regarding finish or performance
 
 testing
 
 by the Government was the following:
 

 4. QUALITY ASSURANCE PROVISIONS
 

 4.2
 
 Visual And Dimensional Examination.
 
 Hinges furnished under this specification shall be examined for the defects____ The inspection level shall be level II ... with an acceptable quality level____
 

 4.3
 
 Finish and performance.
 
 When specified ... samples of hinges from each lot shall be selected in accordance with [regulations]. Samples shall be tested in accordance with 4.4 and 4.5____
 

 4.4
 
 Finish testing.
 
 Finishes of hinges shall be tested in accordance with the procedure detailed in ANSI [American National Standards Institute] A156.1.
 

 4.5
 
 Performance testing.
 
 Hinges ... shall be tested in accordance with the applicable sections of ANSI A156.1____
 

 6.5
 
 Finishes.
 

 6.5.4
 
 Comparison of standard finishes.
 
 Owing to differences in the processes of producing hardware finishes and the variety of metals to which they are applied, it is commercially impracticable to attain an exact match. Therefore, it is understood that hardware delivered in a standard finish from two or more sources will compare reasonably when the items are viewed at arm’s length and approximately two feet apart____
 

 Federal Specification (“FF-H-116E”).
 

 ANSI A156.1, paragraphs 4.1-4.6, describe wear tests for certain types of hinges (but not, explicitly, spring hinges), including a finish test (“Salt Spray” test) that consists of exposing a finished hinge to a salt fog over a period of time followed by visual inspection for signs of corrosion. The test requires that the commercial equivalent of a US10 finish show no “red rust” corrosion to the unaided eye at eighteen hours of salt fog. Builders’ Hardware
 
 *290
 
 Manufacturers Association 101, paragraph 5.2, rev. Sept. 1976.
 

 Prior to initiation of the ‘598 contract, GSA had procured full surface and half surface spring hinges from Mallin Lock Manufacturing Co. (“Mallin”), a competitor of CPI. Although Mallin obtained some of its hardware from Lawrence Brothers, Inc. (“Lawrence”), another of CPI’s competitors, Mallin did not obtain from Lawrence full surface or half surface spring hinges.
 

 By mid-October, 1980, CPI had received four orders for spring hinges. For three of the orders, CPI failed to meet the delivery due dates and, therefore, negotiated a price reduction for late delivery. In December, 1980, CPI tendered for inspection a lot of full surface spring hinges to the agency. GSA rejected the lot, explaining that upon inspection the spring hinges had not met the requirements for button tips, metal gauge, and finish type. The spring hinges supplied by CPI had a US10 finish. However, the finish was not plated and, rather, had been achieved by painting over the base metal followed by coating with a clear acrylic lacquer.
 

 In response to the Contracting Officer’s (“CO”) order to CPI to “show cause” why the contract should not be terminated, CPI attempted to negotiate three changes or equitable adjustments to the contract specification in exchange for a price reduction. The agency agreed to make adjustments relating to the base metal thickness and tips, but did not agree to accept painted spring hinges in lieu of plated ones. In response to CPI’s assertion that the paint finish met the performance requirements of the specifications, GSA responded, in pertinent part, that “[t]he deviation from the US3,[
 
 3
 
 ] brass plated finish required by the contract is not acceptable. The painted finish offered is not as corrosion resistant, nor is it acceptable in appearance.”
 

 On May 7, 1981, CPI informed GSA that if it would not accept painted in lieu of plated spring hinges, “we will be
 
 unable
 
 to perform.” By May 21, 1981, CPI had missed delivery on all but two of fifteen orders for spring hinges. The last two deliveries were due on or before July 15. In June, GSA again issued an order for CPI to show cause within ten days why it should not be terminated for default. CPI’s contract administrator testified before the board that he attempted to locate alternate sources of the spring hinges. He declared that he. was told by Lawrence that it had supplied Mallin with spring hinges, but would not state whether it presently had the ability to manufacture plated spring hinges. He also testified that other suppliers had told him that plated hinges conforming to the specification “are not and have never been made by any manufacturer with a plated finish.” The CO stated that when she telephoned Mallin, it confirmed that it had manufactured and provided plated spring hinges conforming to FF-H-116E. Mallin provided the CO with samples of its spring hinges and an undated catalogue cut from Lawrence.
 

 In July, 1981, the CO terminated the contract with respect to the spring hinges, including CPI’s right to deliver the two orders whose delivery had not yet been effected. CPI filed a timely appeal to the GSA Board of Contract Appeals (“board”).
 

 In September, 1981, GSA issued an advertised solicitation for the spring hinges that had been ordered from CPI, the specifications being the same. Seven bids were opened, and Mallin offered the full surface spring hinges at $3.95 per pair and the half surface spring hinges at $4.25 per pair— both plated. CPI also obtained a copy of the solicitation and submitted a bid offering $4,095 to $4,145 per pair of full surface spring hinges and $4,495 per pair of half surface spring hinges—both types plated. GSA awarded the reprocurement contract,
 
 *291
 
 GS-04S-24398 (“ ’398”), to Mallin, the lowest bidder. Shortly thereafter GSA realized that it had a contract already in effect, GS-04S-24099 (“’099”), with Mallin that covered the spring hinges, at a cost of 30% less than in ’398—$2.50 to $3.75 per pair full surface spring hinges, and $2.50 to $3.50 per pair half surface spring hinges, and the orders were amended to effect a “follow-on” contract. GSA assessed excess reprocurement costs of $8,757.50 against CPI, which amount was reduced to $3,704.00 and then to $3,611.75 to compensate for additional spring hinges ordered under the ’099 contract which should not have been charged to CPI. This amount was recovered by offset against other payments due CPI in March, 1982.
 

 CPI appealed GSA’s assessment of excess costs, and the board consolidated this appeal with that for default termination. The board found that CPI did not submit spring hinges that conformed to the contract. It rejected CPI’s arguments that the agency should have performed finish testing on samples from each lot of spring hinges tendered for inspection and that the failure of the Mallin hinges to meet the ANSI finish test indicates that GSA improperly held CPI’s spring hinges to a higher standard. With respect to the latter contention, the board concluded that “[i]n the absence of more explicit evidence, we cannot equate discoloration and pitting with red rust corrosion visible to the unaided eye.”
 

 The board found CPI’s argument, that it should have been permitted to perform the two GSA orders scheduled for delivery after the date it issued a “show cause” order, lacked merit because the standard default clause authorizes the Government to terminate all or any part of a contract upon a delivery or performance failure.
 

 The board awarded the Government breach of contract damages (explicitly denying excess reprocurement costs) in the amount of $3,611.75, which it found to be the sum of the Government’s losses.
 

 OPINION
 

 Under the CD A, 41 U.S.C. § 609(b), our standard of review is limited, and we may not set aside the board’s decision if it is supported by substantial evidence.
 
 W.M. Schlosser Co. v. United States,
 
 767 F.2d 870 (Fed.Cir.1985).
 

 I.
 
 Default Termination
 

 As we understand CPI’s argument, the default determination affirmed by the board was erroneous because the contract and FF-H-116E require finish testing, which GSA did not perform. It contends that both CPI’s and Mallin’s spring hinges should have been tested for rust and corrosion resistance and since Mallin spring hinges did not conform to the standards to which CPI’s spring hinges were held, GSA improperly applied a higher standard to the CPI spring hinges.
 
 [4]
 

 Paragraph 5.(b) of the General Provisions (Standard Form 32) of the instant contract states that if “any supplies ... are defective ... or ... not in conformity with the requirements of this contract, the Government shall have the right either to reject them ... or to require their correction.” 41 C.F.R. § l-7.102-5(b). Thus, we agree with the board, that the Government, just as any other party, is entitled to receive that for which it contracted and has the right to accept only goods that conform to the specification.
 
 American Electric Contracting Corp. v. United States,
 
 579 F.2d 602, 608 (Ct.Cl.1978)
 
 (per curiam)
 
 (and cases cited);
 
 Mission Valve and Pump Co. v. United States,
 
 69-2 BCA ¶ 8010 at 37,243 (ASBCA 1969).
 

 Thus, CPI’s proffer of painted rather than plated spring hinges, even at a reduced price, need not have been accepted.
 
 *292
 
 Although GSA agreed to waive the requirements of button tips and base metal gauge in return for a price reduction, it was within its rights under paragraph 5.(b) to refuse to waive the requirement for a plated finish. This right is limited only by the obligation of the Government to abide by the contract as well.
 

 The reasons stated for rejecting the proffered spring hinges were (1) the painted finish was not as corrosion resistant as the plated finish and (2) the appearance of the painted finish was not acceptable. CPI contends that, with respect to the first reason, the only reasonable interpretation of the contract and specifications (including the finish requirements under FF-H-116E) imposed upon GSA the obligation to test the finish on the hinges. We agree with the board that CPI’s interpretation is unreasonable.
 

 FF-H-116E, paragraph 4.3, imposes upon CPI the requirement to submit hinges
 
 to permit testing
 
 under the pertinent standards. The purpose of sampling is to allow the Government to ensure that it will receive the goods for which it has contracted. Also, under paragraph 4.3, all of the samples “shall be tested” in accordance with paragraphs 4.4 and 4.5. Paragraphs 4.5 and 4.4 provide that the hinges “shall be tested in accordance with” ANSI A156.1. The ANSI testing standards
 
 do not
 
 include a mandatory procedure for testing spring hinges. Therefore, GSA was not required to test the spring hinge finish, and the board’s conclusion to this effect is not erroneous.
 

 In this case, the default termination was based in part on the fact that CPI’s spring hinges did not perform as well as plated spring hinges when tested for corrosion resistance. The board found that CPI’s independent laboratory results on the Mal-lín hinge “showed discoloration and pitting at the end of four, and then eight, hours of [salt spray] exposure. After eighteen hours, rust was evident ... and the exposed area ... was ‘severely rusted.’ ” 84-2 BCA at 86,481. Had the board
 
 sua sponte
 
 interpreted the above-quoted test results to be the equivalent of the ANSI “red rust” corrosion, it would have imper-missibly undermined the purpose of ANSI examinations to promote uniformity. Thus, we are persuaded that substantial evidence supports the board’s finding that CPI’s showing that the Mallín plated hinges did not perform as well as the painted hinges was critically defective due to its lack of specificity or precision, and failed to establish CPI’s
 
 prima facie
 
 case. (In addition, we note that in at least one laboratory report there is no evidence that the hinges tested were Mallín hinges.)
 

 Moreover, default termination would have been appropriate if only based on the alternative basis of failure to pass the visual similarity test. The visual test provision in FF-H-116E paragraph 6.5.4, set forth above, allows the Government to determine whether spring hinges resemble those purchased from a different source, which provision is clearly designed to ensure uniformity in purchased goods. Thus, GSA’s visual similarity test is not impermissibly a “matter of whim or caprice.”
 
 A.B.G. Instrument & Engineering, Inc. v. United States,
 
 593 F.2d 394, 404 (Ct.Cl.1979). CPI does not argue that the board’s finding on this issue is unsubstantiated.
 

 CPI does not contend that it timely supplied hinges to GSA. Although it attempted to show that its failure was beyond its control (and therefore excusable under the standard default clause) by claiming that hinges meeting the specifications were not and had never been manufactured, this argument was rebutted by the evidence that Mallin produced such hinges.
 
 Cf. B.F. Goodrich Co. v. United States,
 
 76-2 BCA ¶ 12,105 (ASBCA 1976) (where another supplier has demonstrated compliance with contract specifications, it is appropriate to consider the contractor’s statement that the item called for is “not available and is beyond the state-of-the-art” as a repudiation of the contract). We are satisfied that the decision of the board sustaining the default termination is supported by substantial evidence.
 

 
 *293
 
 CPI’s argument, that the two orders still outstanding at the time of the default determination in July of 1981 precluded default termination, is meritless. When there is a “positive, definite, unconditional, and unequivocal manifestation of intent ... on the part of a contractor of his intent not to render the promised performance when the time fixed therefor by the contract shall arrive, the contracting officer ... may terminate the contract forthwith on the ground of anticipatory breach.”
 
 Mission Valve and Pump Co.,
 
 69-2 BCA at 37,243 (and cases cited);
 
 Dingley v. Oler,
 
 117 U.S. 490, 503, 6 S.Ct. 850, 854, 29 L.Ed. 984 (1886);
 
 Kennedy v. United States,
 
 164 Ct.Cl. 507, 514 (1964).
 
 [5]
 
 CPI’s statement that “we will be
 
 unable
 
 [correct emphasis in original letter] to perform” if the painted hinge is unacceptable, is a clear expression of inability to perform in conformance with the contract requirements.
 
 See Bendix Corp. v. United States,
 
 77-2 BCA ¶ 12,656 (GSBCA 1977);
 
 National Farm Equipment Co. v. United States,
 
 73-2 BCA ¶ 10,300 at 48,627 (GSBCA 1973). Accordingly, there is no error in the board’s findings that CPI breached the contract and that GSA was justified in upholding the decision to terminate for default.
 

 II.
 
 Assessment of Damages
 

 Under provision ll.(b) of the General Provisions of the contract (pursuant to 41 C.F.R. § 1-8.707), when a contractor defaults, the Government “may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies ... [the same or] similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies.”
 
 See also
 
 41 C.F.R. § 1-8.602-6, FPR 1-8.602-6, to the same effect. Section ll.(f) can reasonably be read to permit the Government to proceed against a Contractor under other than specific contractual remedies, including the common law cause of action for breach of contract damages (hereafter “damages”).
 
 Rumley,
 
 285 F.2d at 777;
 
 see supra
 
 note 5. This is not contested by CPI.
 

 CPI contends, however, that excess re-procurement costs were improperly assessed by GSA and that the
 
 sua sponte
 
 imposition of-damages rather than excess costs requested by the Government violates CPI’s procedural due process right to sufficient notice of the charges, under either the CDA or the Federal Claims Collection Act of 1966 (“FCCA”).
 
 [6]
 

 To uphold the board’s decision to impose a monetary assessment against CPI, we must conclude that CPI received adequate notice of the possibility of the imposition of damages from the proceedings before the board and that the board correctly imposed damages; or, alternatively, that even though the board erroneously imposed damages, the Government adequately demonstrated its entitlement to excess repro-curement costs.
 

 A.
 
 Excess Costs or Damages
 

 The measure of damages is the reasonable reprocurement price less the original contract price.
 
 Marley v. United States,
 
 423 F.2d 324, 333 (Ct.Cl.1970);
 
 Rumley,
 
 285 F.2d at 777; J. Calimari and J. Perillo, Contracts 547 (2d ed. 1977). In contrast, excess reprocurement costs may be imposed only when the Government meets its burden of persuasion that the
 
 *294
 
 following conditions (factual determinations) are met: (1) the reprocured supplies are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default. 41 C.F.R. § 1-8.602-6(a), FPR 1-8.602-6(a);
 
 Astro-Space Laboratories, Inc. v. United States,
 
 470 F.2d 1003, 1018 (Ct.Cl.1972);
 
 Environmental Tectonics Corp. v. United States,
 
 78-1 BCA ¶ 12,986 (ASBCA 1978);
 
 Solar Laboratories, Inc. v. United States,
 
 76-2 BCA ¶ 12,115 (ASBCA 1976). The first condition is demonstrated by comparing the item reprocured with the item specified in the original contract.
 
 Environmental Tectonics Corp.,
 
 78-1 BCA at 63,308. The second condition requires the Government to show what it spent in reprocurement.
 
 Fairfield Scientific Corp. v. United States,
 
 611 F.2d 854, 863-66 (Ct.Cl.1979). The third condition requires that the Government act within a reasonable time of the default, use the most efficient method of reprocurement,
 
 [7]
 
 obtain a reasonable price, and mitigate its losses.
 
 Astro-Space Laboratories, Inc.,
 
 470 F.2d at 1018;
 
 Environmental Tectonics Corp.,
 
 78-1 BCA at 63,308, 63,309-10;
 
 Solar Laboratories, Inc.,
 
 76-2 BCA at 58,195-96.
 

 The board concluded that condition (2) was not met by GSA because it failed to introduce the reprocurement contract with Mallin, and states that there was inadequate information on condition (3). Also, CPI argues that the Mallin spring hinges failed to satisfy condition (1). It asserts that since the Mallin spring hinges did not perform under testing equal to or better than its spring hinges, reprocurement of Mallin spring hinges would not fulfill the condition that the reprocured spring hinges meet the requirements of the contract. We considered this argument earlier and deem it meritless because Mallin spring hinges offered to GSA were plated and otherwise met the requirements of the specifications.
 

 We disagree with the board that GSA failed to meet condition (2),
 
 [8]
 
 but we agree that without introduction of the follow-on contract, the board did not have sufficient evidence to make a finding on condition (3). Therefore, the board was correct in declining to assess excess costs of reprocurement against CPI.
 

 With respect to the assessment of damages, we are persuaded that the board’s conclusion that “[tjhere is ample evidence in this record from which we may conclude that the price of the substituted performance, as measured by the prices the Government would have paid under Mallin’s successor requirements contract, was reasonable.” 84-2 BCA at 86,483. The evidence includes a Lawrence Brothers catalogue cut showing a spring hinge (not necessarily possessing a US10 finish), six competitors’ bids, including that of Mallin for its plated spring hinges, and CPI’s
 
 own
 
 bid prices, which were
 
 more
 
 than its original bid
 
 by an average of about $1.25 per pair.
 

 [9]
 

 The board correctly reduced the Government’s claim to reflect the true number of pairs of spring hinges reprocured.
 

 B.
 
 Due Process
 

 We disagree with CPI that the board violated its due process right to sufficient notice of the charges. CPI argues that the evidence does not support the board’s finding that damages were proven and that the board impermissibly “chang[ed] the theory under which it permitted] the Government to recover its excess costs of reprocurement.”
 

 
 *295
 
 . As pointed out earlier, the record amply supports the board’s conclusion that default termination was compensable by the imposition of damages. Accordingly, we disagree with CPI that the damages were inadequately supported by the evidence.
 

 Thus, we reach CPI’s second argument on the due process issue, viz., that the board violated principles of fundamental fairness by impermissibly “changpng] the theory” of recovery by imposing damages
 
 sua sponte.
 
 This is an issue of first impression in this court. However, we are persuaded by the reasoning of the Claims Court in its recent opinion
 
 Tester Corp. v. United States,
 
 1 Cl.Ct. 370 (1982). In that case, the Board of Contract Appeals had awarded the Government damages. On appeal, Tester contended that the Government could not recover because it had not specifically asserted a claim for common law damages (a cause of action not explicitly provided for in the standard default clause) in its pleadings. After discussing
 
 Rumley
 
 and
 
 Marley, supra,
 
 the court stated:
 

 Plaintiff reads into [“excess costs”] a finding that the matter before the court now is an “excess costs” case and not a breach of contract case where the remedy is common law damages. Such reasoning and argument is specious____
 

 It is well settled that technical rules of pleading are a relic of the past. All that a pleading is required to do is to give fair notice of the claim asserted to the other side____ In this case, it is concluded that the government’s [claim], as pleaded, is legally sufficient and fairly appraises
 
 [sic
 
 ] plaintiff of the nature and amount of the claim asserted against plaintiff____ In clear, simple and concise form, defendant has claimed all “additional costs” incurred as a result of plaintiff’s breach____ [The government] .provided plaintiff with sufficient notice of its damages claim. Despite plaintiff’s contentions, the magic words “common law damages” need not appear in a pleading which seeks recovery for breach of contract.
 

 1 Cl.Ct. at 376-77 (citations omitted). In this case, as in
 
 Tester,
 
 GSA made clear to CPI both the
 
 basis
 
 for recovery sought, which was CPI’s breach, and the
 
 amount
 
 of recovery sought, which was full compensation for the costs to which it was put to reprocure the spring hinges CPI failed to provide. Moreover, CPI
 
 argued
 
 these issues from every conceivable angle before the CO and the board. Therefore, the board did not violate CPI’s due process rights when it awarded the Government damages in lieu of excess reprocurement costs.
 

 Finally, CPI argues that it was denied due process because GSA did not give CPI legally sufficient notice, under either the CDA or the FCCA, 31 U.S.C. § 953, that it would assess excess reprocurement costs. ‘ CPI says that both acts, as interpreted by 4 C.F.R. § 102.3, require that GSA offer it the opportunity for a “pre-offset oral hearing.” In addition, CPI infers from the CDA, 41 U.S.C. § 605(a), that “when the Government submits a claim or lodges an ‘offset’ against a contractor, the law basically provides protection of the right to a hearing on
 
 the evidence
 
 upon which the Government intends to rely.” However, CPI has not asserted, much less demonstrated, any harmful error.
 

 4 C.F.R. § 102.3 (1982), in effect at the time of the administrative offset,
 
 [10]
 
 does
 
 not
 
 mandate a “pre-offset oral hearing” under the circumstances presented in this case. The regulation merely describes the pre-offset procedure in the collection of a debt by offset from Government employees. Thus, CPI’s assertion of the applicability of the language in section 102.3(b) referring to a “pre-offset oral hearing” is incorrect.
 

 
 *296
 
 There is no question that the contract to which CPI was a party is covered exclusively by the provisions of the CDA, which became effective for all Government contracts in 1979. There is ample evidence showing that the provisions of 41 U.S.C. § 605(a) were complied with. Moreover, 41 C.F.R. § l-8.602-7(b) provides the Government with the authority to “take appropriate action to assert the Government’s claim for such damages.”
 

 The FCCA, section 4, provides only that “[n]othing in this chapter shall increase or diminish the existing authority of the head of an agency to litigate claims, or diminish his existing authority to settle, compromise, or close claims,” thus indicating that the act was not intended to abrogate the common law rights of the Government to offset.
 
 See Project Map, Inc. v. United States,
 
 486 F.2d 1375, 1376 (Ct.Cl.1973);
 
 see also Brookfield Construction Co. v. United States,
 
 661 F.2d 159, 165 (Ct.Cl.1981).
 
 [11]
 
 Therefore, the FCCA does not constrain GSA’s administration of this contract in any way.
 

 III.
 
 Conclusion
 

 In view of the foregoing, we affirm the decision of the board.
 
 [12]
 

 AFFIRMED.
 

 [1]
 

 . The board’s opinion, published at 84-2 BCA ¶ 17,354 (GSBCA 1984), describes the facts in detail.
 

 [2]
 

 . "Finish” evidently describes anything more than the base metal spring hinge, and the plating and the US10 finish requirement were described in the
 
 "Regular finishes
 
 ” provision of the specification. However, the "finish symbol,"
 
 e.g.,
 
 US3, US4, US10, etc., describes the finished appearance of builders’ hardware and does not prescribe the type of base material. US10 is a clear coated satin bronze finish.
 

 [3]
 

 . The reference to US3 in several communications of both the GSA and CPI, rather than to US10 required under the specification, was apparently an inadvertent mistake. Until oral argument in this court, neither party asserted that it was confused over what it referred to. Thus, this slip did not constitute harmful error. We disagree with CPI's assertion at the hearing that GSA believed there was “no big difference” between a US3 finish and a US10 finish.
 

 [4]
 

 . CPI argues that because the Mallin spring hinges’ performance was not equal to or better than CPI's when given the Salt Spray test, it did not matter under the contract whether the hinges were painted or plated; thus, the Mallin plated spring hinges are not the same as, or similar to, those required under the contract. This argument is more appropriately addressed below, where we discuss the propriety of assessing damages.
 

 [5]
 

 . The default clause does not explicitly provide for a default termination in response to an anticipatory repudiation. However, the Government possesses a right to assert breach of contract under the common law theory of anticipatory breach as one of the "other rights and remedies provided by law" under provision 11.-(f). R. Nash and J. Cibinic, Jr., Federal Procurement Law 1669 (3d ed. 1980);
 
 Rumley v. United States,
 
 285 F.2d 773, 777 (Ct.Cl.1961). Alternatively, the Government may support this common law theory by asserting “fails to make delivery,” under provision 11.(a)(i)
 
 (see
 
 41 C.F.R. § 1-8.602-3(a)), or "fails to perform ... or so fails to make progress as to endanger performance" under provision 11.(a)(ii)
 
 (Mission Valve and Pump Co.,
 
 69-2 BCA at 37,243;
 
 see
 
 41 C.F.R. § 1-8.602-3(b) ).
 

 [6]
 

 . 31 U.S.C. §§ 951-953 (1976), subsequently replaced by the Debt Collection Act of 1982, 31 U.S.C. §§ 3701-3731 (1982).
 

 [7]
 

 . 41 C.F.R. § 1-8.602-6(b), FPR 1-8.602-6(b), dictates the utilization of formal advertising procedures “except where there is good reason to negotiate.” In this case, GSA formally advertised.
 

 [8]
 

 . Although not fully described in the board’s opinion, there is ample evidence in the record of sales to Mallin under the follow-up contract.
 

 [9]
 

 . Apparently, CPI is not aware of the rule that, whereas the Government may consider a defaulted contractor for reprocurement, the contractor may not receive more than the initial contract price for its reprocurement performance.
 
 Churchill Chemical Corp. v. United States,
 
 602 F.2d 358, 364 (Ct.Cl.1979).
 

 [10]
 

 . Section 102.3 in 1982 differs radically from the section 102.3 in the prior editions of the Code of Federal Regulations. Although we are not fully persuaded that the 1982 regulation applies in this case (because the contract was executed in 1980 and termination proceedings were initiated in 1981), we concede this point for the sake of resolving CPI’s contention.
 

 [11]
 

 . The Government asserts that the Debt Collection Act of 1982, the successor of the FCCA, also does not apply to restrict the Government’s right to offset. We do not respond to this contention, because the Debt Collection Act was enacted after the instigation of the present litigation and, therefore, cannot be construed to apply to the contract in suit.
 

 [12]
 

 . In view of our holding that due process was not violated when the CO failed to make the default determination following the provisions of the Debt Collection Act of 1982, we decline to grant the motion of Cecile Industries, Inc. for permission to file an
 
 amicus
 
 brief.